In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1156

MC WINSTON,

*Petitioner-Appellant*,

*v.*

ANA BOATWRIGHT,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-0777—**William E. Callahan, Jr.**, *Magistrate Judge.*

ARGUED OCTOBER 25, 2010—DECIDED AUGUST 19, 2011

Before WOOD, WILLIAMS, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* For more than 130 years, federal courts have held that discrimination in jury selection offends the Equal Protection Clause. See, *e.g.*, *Smith v. Texas*, 311 U.S. 128, 130-32 (1940); *Norris v. Alabama*, 294 U.S. 587, 599 (1935); *Neal v. Delaware*, 103 U.S. 370, 397-98 (1881). Early cases focused on the systemic exclusion of racial minorities from juries through state statutes, *e.g.*, *Strauder v. West Virginia*, 100 U.S. 303 (1880); later,

attention turned to the race-based use of peremptory challenges by prosecutors. *Batson v. Kentucky*, 476 U.S. 79 (1986). More recently, the constitutional prohibition on discrimination in jury selection has been extended beyond race to gender. Moreover, the fact that society as a whole has an interest in the integrity of the jury system has been acknowledged. The anti-discrimination principle is thus not just a privilege of the criminal defendant; it constrains prosecutors, criminal defense lawyers, and civil litigants alike. Intentional discrimination by any participant in the justice system undermines the rule of law and, by so doing, harms the parties, the people called for jury duty, and the public as a whole. See *J.E.B. v. Alabama*, 511 U.S. 127 (1994) (applying *Batson* to gender-based peremptory strikes); *Georgia v. McCollum*, 505 U.S. 42 (1992) (applying *Batson* to criminal defense counsel); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) (applying *Batson* to civil litigants); *Powers v. Ohio*, 499 U.S. 400, 405-07 (1991) (describing the harms of discrimination in juror selection); *Batson*, 476 U.S. at 86-88. As this case illustrates, however, discrimination in the selection of jurors has not yet been eradicated.

In a nutshell, this case presents the question whether the constitutional rights of the petitioner, MC Winston, were violated when *his* lawyer used peremptory challenges systematically to eliminate all men from the jury in his trial for second-degree sexual assault. Winston argued that this violated both his rights under the Equal Protection Clause and his Sixth Amendment right to effective assistance of counsel under *Strickland v.*

*Washington*, 466 U.S. 668 (1984). His efforts were unsuccessful both in state post-conviction proceedings and then in the federal district court. Winston has now turned to us.

Although our role in federal *habeas corpus* proceedings is limited, it has not vanished altogether. We conclude here that a defense lawyer's intentional violation of the Equal Protection Clause falls below the performance standard established by *Strickland.* The more difficult issue is whether Winston can show prejudice. Resolution of that part of the *Strickland* inquiry requires us to choose between two competing lines of authority from the U.S. Supreme Court. Because the Court itself did not signal how it would make that choice until well after the state courts acted in Winston's case, we have no basis for finding that the state courts disregarded any "clearly established" precedents. We therefore affirm the judgment of the district court denying Winston's petition.

# I

On October 5, 2001, a fifteen-year-old girl, Candida, skipped school and stopped by Kandy Konnecktion, a convenience store in Milwaukee. Though primarily a candy shop, the store also sold cigarettes, which Candida meant to buy illegally. Winston, an employee whom Candida knew, was working that day. Upon her arrival, Candida told Winston that she wanted to "kick it" for the day. Around lunchtime, Winston left with her to get Chinese food; he also bought gin, lemonade, and beer.

From there, as Candida would later testify at trial, things escalated. The two returned to the store and began to drink the alcohol while sitting on a mattress in a back storage room. After Candida had consumed a few concoctions of gin and lemonade and Winston drank some beer, Winston began to stroke her hair, but she slapped his hand away. On Candida's account, Winston then removed her clothing, fondled and licked her breasts and genitals, and briefly had sex with her. Winston admits hanging out and drinking alcohol with Candida, but he denies ever touching her in an inappropriate or sexual manner.

In light of these events, the state charged Winston with one count of second-degree sexual assault of a child by means of sexual intercourse. See WIS. STAT. § 948.02(2). Before trial, the state reduced that charge to sexual assault on the basis of sexual contact. The jury, however, failed to reach a verdict, and so the trial court ordered a mistrial. The state then amended the charge to include two counts of second-degree sexual assault— one for sexual contact and one for sexual intercourse. At that point, the court appointed new counsel for Winston; this was the lawyer whose conduct is at issue here. Winston went to trial in September 2002. The second jury, which was composed entirely of women, acquitted Winston of sexual intercourse but found him guilty of unlawful sexual contact. After his motion for a new trial was denied and with his third appointed attorney, Winston appealed his conviction, which the Wisconsin Court of Appeals affirmed. *State v. Winston*, No. 03-3412-CR, 2004 WL 1982229 (Wis. Ct. App.

Sept. 8, 2004) (unpublished) (*Winston I*). The Wisconsin Supreme Court summarily denied Winston's petition for review. *State v. Winston*, 693 N.W.2d 76 (Wis. 2005).

Proceeding without an attorney, Winston then filed a motion for a new trial. He asserted that he had received ineffective assistance of both trial and appellate counsel in a number of respects, including failure to raise the issue of prosecutorial misconduct, purposeful discrimination in jury selection, and failure to request new DNA testing. One new item of evidence obtained in these post-conviction proceedings was a June 9, 2003, letter from the appellate lawyer that explained why no *Batson* claim had been raised in either the trial court or on appeal. Although that letter failed initially to make its way into the record in this court, Winston's new counsel have managed to find page one of the letter for us. (We understand that the entire letter was before the state courts.) The state post-conviction court stated that the *prosecutor*'s peremptory challenges were used to strike women from the panel. Page one of the letter reports that the prosecutor used his seven peremptory challenges to strike six women and one man, and the defense lawyer used his to strike six men and one woman. This information "supports [the defense lawyer's] statement that the all-woman jury resulted from his actions." Tellingly, post-conviction counsel opined that this was not enough to support a claim of ineffective assistance, because it proved that the lawyer had a strategic reason for his actions. Winston's state appellate lawyer similarly explained that she refrained from raising a *Batson* claim against the original trial lawyer

because "she learned from trial counsel that the reason he struck the male jurors is because he thought that the female jurors would be more critical of the victim." The state post-conviction court denied relief because it found that striking the female jurors was "trial counsel's strategy" and "reasonable under the circumstances."

On appeal during the post-conviction stage, the Wisconsin Court of Appeals granted that "trial counsel's strategic reason for favoring female jurors was his belief that they would be more critical of the victim than male jurors would be." *State v. Winston*, 2007 WL 586394, at ¶ 13 (Wis. Ct. App. Feb. 27, 2007) (unpublished) (*Winston II*). It rejected Winston's *Strickland* claim (and the underlying *Batson* theory), however, because the court found that the lawyer was following a reasonable defense strategy and therefore, his actions were " 'virtually unchallengable.' " *Id.* (quoting *Strickland*, 466 U.S. at 690-91). In addition, the court noted that the result of Winston's second trial—acquittal of the sexual intercourse offense—"blunts Winston's contention" that he was "harshly judged by the jury in part because it consisted entirely of women." *Id.* at ¶ 12-13. On July 17, 2007, the Wisconsin Supreme Court again summarily denied Winston's petition for review. *State v. Winston*, 741 N.W.2d 239 (Wis. 2007).

Still representing himself, Winston filed a petition for *habeas corpus* in federal court. The district court denied the petition, but it granted Winston a certificate of appealability limited to "whether trial counsel was ineffective in his exercise of peremptory challenges, and

if so, whether a new trial should be ordered." See 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336-41 (2003) (describing standards for granting a certificate of appealability in *Batson* case). The district court appointed counsel, and this appeal followed.

## II

### A

Our review of Winston's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which "tightly constrains the availability of the writ." *Stock v. Rednour*, 621 F.3d 644, 649 (7th Cir. 2010). We may grant relief to Winston "only if the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent." *Kerr v. Thurmer*, 639 F.3d 315, 318 (7th Cir. 2011); see 28 U.S.C. § 2254(d)(1). Winston focuses on the unreasonable application provision, which demands more than "just" an incorrect application of federal law. See *Harrington v. Richter*, 131 S. Ct. 770, 785-86 (2011). A state court unreasonably applies controlling Supreme Court precedent when it "identifies the correct governing legal rule" from the Court's cases, "but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). An unreasonable application also occurs when a state court unreasonably refuses to extend a governing legal principle to a context in which it should have controlled, or "unreasonably extends a principle to a situation in which it should *not* have controlled." *Jones*

*v. Basinger*, 635 F.3d 1030, 1044 (7th Cir. 2011); see *Williams*, 529 U.S. at 407.

The "unreasonable application" inquiry is an objective one. *Williams*, 529 U.S. at 409. That is, we consider "whether it is possible fairminded jurists could disagree" that the state court's arguments or theories are inconsistent with the holdings of prior decisions of the Supreme Court. *Richter*, 131 S. Ct. at 786. The writ may issue only when "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. As the Court has made clear, section 2254(d)(1) "would be undermined if *habeas* courts introduced rules not clearly established under the guise of extensions to existing law." *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

That said, AEDPA does not preclude all relief. "Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Id.* For that reason, courts are not prohibited from finding an application of a legal *principle* unreasonable when it involves different *facts* from those of the case that announced the principle. See *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

B

To assess Winston's claim, we begin by "determining the relevant clearly established law," as set forth by the

Supreme Court at the time the state court acted. *Yarborough*, 541 U.S. at 660. This requires us to review both the *Strickland* line of cases, which govern assertions of ineffective assistance of counsel in violation of his Sixth Amendment rights, and the *Batson* line of cases, which underlie Winston's arguments about his lawyer's unsatisfactory performance. In order to prevail on his *Strickland* claim, Winston "had to show both that his counsel provided deficient assistance and that there was prejudice as a result." *Richter*, 131 S. Ct. at 787. To establish deficient performance, he had to show that his "counsel's representation fell below an objective standard of reasonableness," evaluated under "prevailing professional norms," *Strickland*, 466 U.S. at 687-88, not "best practices or most common custom." *Richter*, 131 S. Ct. at 788. Among other things, this means that we do not second-guess the wide range of reasonable professional assistance available to an attorney; our scrutiny of a lawyer's performance is "highly deferential." *Strickland*, 466 U.S. at 689. When a case reaches us through section 2254(d)(1), we defer not only to counsel's reasonable choices, but also to the state court's evaluation of that issue. See *Richter*, 131 S. Ct. at 788. To establish prejudice, "a challenger must demonstrate a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 787 (quoting *Strickland*, 466 U.S. at 694). Once again, we must defer to the state court's assessment of the existence of such a reasonable probability.

Before this court, Winston relies exclusively on the Supreme Court's *Batson* cases to demonstrate that his lawyer's performance was constitutionally inadequate. *Batson* applied the Equal Protection Clause to a prosecutor's use of peremptory challenges exercised on the basis of race, 476 U.S. at 89-90, establishing a three-part inquiry "designed to ensure that a State does not use peremptory challenges to strike any . . . juror because of his race." *Id.* at 99 n.22. The upshot of *Batson* is that the exclusion of even a single prospective juror for racial (or comparable) reasons violates the Constitution. See *J.E.B.*, 511 U.S. at 142 n.13; see also, *e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Typically, to prove an equal protection violation under *Batson*, "once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (*per curiam*).

Though *Batson* dealt with race discrimination by prosecutors, its legal principle has been extended to prohibit certain other forms of intentional discrimination in jury selection. In *Powers v. Ohio*, the Supreme Court rejected the premise that persons of the same race cannot discriminate on the basis of their shared race and held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the

excluded juror share the same races." 499 U.S. 400, 402 (1991). To hold otherwise and permit such a race-based inference, it said, would "accept as a defense to racial discrimination the very stereotype the law condemns." *Id.* at 410. *Powers* also emphasized that the constitutional prohibition on discriminatory jury selection serves not only the rights of the criminal defendant but also the rights of the prospective juror "not to be excluded from [a petit jury] on account of race." *Id.* at 409. In addition, because the "purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair," *id.* at 413, prohibiting discrimination in jury selection also preserves the integrity of the criminal justice system. See *id.* ("The verdict will not be accepted or understood in these terms [of fairness] if the jury is chosen by unlawful means at the outset.").

The teaching of *Batson* and *Powers* is simple: equal protection goes both ways. This is why *Georgia v. McCollum* held that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges"; "the exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party." 505 U.S. 42, 59 (1992). Like a prosecutor, the criminal defense lawyer upsets the fairness of, and public confidence in, the criminal justice system by discriminating in the selection of the jury. See *id.* at 48-50 & n.6.

*J.E.B. v. Alabama* applied *Batson* to the use of peremp-
tory challenges on the basis of gender; it held that
"gender, like race, is an unconstitutional proxy for juror
competence and impartiality." 511 U.S. at 129. Following
up on *Powers* and *McCollum*, *J.E.B.* reiterated the harm
caused by stereotypes in jury selection: "Discrimination
in jury selection, whether based on race or gender,
causes harm to the litigants, the community, and the
individual jurors who are wrongfully excluded from
participation in the judicial process. The litigants are
harmed by the risk that the prejudice that motivated
the discriminatory selection of the jury will infect the
entire proceedings," and the "community is harmed by
the State's participation in the perpetuation of invidious
group stereotypes and the inevitable loss of confidence
in our judicial system that state-sanctioned discrimina-
tion in the courtroom engenders." *Id.* at 140. Where
"gender-related issues are prominent," the dangers of
stereotypes and their attendant potential to create
cynicism about the jury's neutrality are "particularly
acute*." Id.*

C

Once a *Batson* violation is proved, the question of
remedy arises. We look at this in some detail, because
in the end it is pertinent to Winston's ability to satisfy
the standards prescribed by 28 U.S.C. § 2254(d)(1). To
keep matters clear, we look first at the straightforward
case, in which the *Batson* issue comes up directly (either
from federal court or state court), and we then explore

the complications that arise when it must be filtered through the lens of collateral review for ineffective assistance of counsel. In the former context, *Batson* is clear: "if the trial court decides that the facts establish, *prima facie*, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents *require* that petitioner's conviction be reversed." *Batson*, 476 U.S. at 100 (emphasis added). Notably, the Court made no mention of any kind of harmless error inquiry.

*Batson* itself as well as the cases that follow it confirm that when a violation of equal protection in jury selection has been proven, the remedy is a new trial, without the need for any inquiry into harmless error or examination of the empaneled jury. (We set to one side the post-*Batson* decisions that raise only the question whether the proper procedures were followed, see, *e.g.*, *Purkett*, 514 U.S. at 767-70, or whether additional evidence is necessary to determine the basis for a juror strike, *e.g.*, *McCollum*, 505 U.S. at 59. Neither of those problems exists here.) In fact, since a time well before *Batson* was decided, the Court has followed an automatic reversal rule once a violation of equal protection in the selection of jurors has been proven. See, *e.g.*, *Smith*, 311 U.S. at 132; *Pierre v. Louisiana*, 306 U.S. 354, 362 (1939); *Neal*, 103 U.S. at 397-98; *Strauder*, 100 U.S. at 312. That rule is simple: "If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand." *Smith*, 311 U.S. at 132.

*Batson* relied on three cases that employed this remedial approach. 476 U.S. at 100. First, *Whitus v.*

*Georgia* held that "a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race." 385 U.S. 545, 549-50 (1967). Likewise, *Hernandez v. Texas* held that where "[t]he result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner," the "judgment of conviction must be reversed." 347 U.S. 475, 482 (1954). Finally, *Patton v. Mississippi* held that "[w]hen a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any . . . racial group, indictments and verdicts returned against them by juries thus selected cannot stand." 332 U.S. 463, 469 (1947). *Patton* further explained that while a conviction must be reversed in the first instance, this "does not mean that a guilty defendant must go free. For indictments can be returned and convictions can be obtained by juries selected as the Constitution commands." *Id.* (citing *Hill v. Texas*, 316 U.S. 400, 406 (1942)).

Put in the Court's current terminology, these cases indicate that intentional discrimination on the basis of race in jury selection is a structural error. See *Arizona v. Fulminante*, 499 U.S. 279, 308-10 (1991). Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," because the "entire conduct of the trial from beginning to end is . . . affected" by the error. *Id.* at 309-10; see also *Neder v. United States*, 527 U.S. 1, 8 (1999) ("Such errors infect the entire trial process and necessarily render a trial fundamentally unfair." (internal quotation marks

and citation omitted)). In addition, structural errors "require automatic reversal" because they affect the "framework in which the trial proceeds, as opposed to errors in the trial process itself." *United States v. Harbin*, 250 F.3d 532, 542 (7th Cir. 2001); see also *Washington v. Recuenco*, 548 U.S. 212, 218 (2006) (explaining that when an "error is structural" it "thus requires automatic reversal").

The legal principle that a substantive *Batson* violation requires reversal without further ado finds support in other cases examining the effects of equal protection violations in the selection of juries. *Batson* affirmed that "the basic principles prohibiting exclusion of persons from participation in jury service on account of their race 'are essentially the same for grand juries and for petit juries.'" *Batson*, 476 U.S. at 84 n.3 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 626 n.3 (1972)); see also *Whitus*, 385 U.S. at 549-50; *Patton*, 332 U.S. at 469; *cf. Pierre*, 306 U.S. at 362 ("Principles which forbid discrimination in the selection of Petit Juries also govern the selection of Grand Juries."). Bearing in mind this equivalence between discrimination in the grand and petit juries, we find *Vasquez v. Hillery* instructive for the problem before us. 474 U.S. 254 (1986). In *Hillery,* the Court held "that discrimination on the basis of race in the selection of grand jurors 'strikes at the fundamental values of our judicial system and our society as a whole.'" It refused to extend the harmless-error standard to this context because such discrimination is a form of structural error. *Id.* at 261 (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)); see also *Recuenco*, 548 U.S. at 218

n.2 (classifying *Hillery* as involving structural error); *Neder*, 527 U.S. at 8 (same); *Fulminate*, 499 U.S. at 310 (same).

The hallmark of a structural error is that the error persists throughout the proceeding and relates to the framework in which a trial proceeds. A *Batson* error meets that description: "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. . . . The composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow." *Powers*, 499 U.S. at 412-13. It is therefore not surprising that in a case decided several years after Winston's state-court proceedings, the Supreme Court unanimously affirmed that *Batson* is an "automatic reversal precedent[]." *Rivera v. Illinois*, 129 S. Ct. 1446, 1455 (2009). *Rivera* distinguishes between the remedy required for an ordinary error in the denial of a peremptory challenge and the kind of constitutional error that occurs when a juror is excluded on racial grounds. In the former case, harmless error analysis is proper, and the court must decide whether the jurors who actually sat were qualified and unbiased. If they were, then the erroneous use of the peremptory challenge is harmless. The Court addressed *Batson*, in contrast, in a section of the opinion discussing the automatic reversal precedents. *Id.* at 1455-56.

It was *Rivera* that clarified the boundary between these two lines of authority relating to peremptory challenges—

those that do and do not qualify for automatic reversal. When the defendant's complaint is that he was forced to use a peremptory challenge as a result of the trial court's erroneous denial of a challenge for cause, the Court has required a showing of prejudice. See *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). In *Martinez-Salazar* the Court explained that "if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." *Id.* at 307. On the surface, *Rivera* was a case close to the boundary of these two lines. There the defendant challenged the trial court's rejection of his peremptory challenge to an Hispanic juror, who wound up sitting on his trial jury. The Supreme Court of Illinois held that the court should have allowed the challenge, but it found that the error was harmless. Upholding that decision, the Supreme Court recognized that *Batson* concerns lay behind the trial court's ruling. Importantly, however, the Supreme Court of Illinois had found that "the record fails to support a *prima facie* case of discrimination *of any kind*." *Rivera*, 129 S. Ct. at 1452. Under those circumstances, the Court followed *Martinez-Salazar* and held that "the erroneous denial of a peremptory challenge" does not "require[] automatic reversal of a defendant's conviction as a matter of federal law." *Id*. at 1452. Instead, errors are to be assessed by inquiring whether the jury eventually empaneled was impartial, qualified, and not challengeable for cause. See *id.* at 1454; *Martinez-Salazar*, 528 U.S. at 316-17; *Ross v. Oklahoma*, 487 U.S. 81, 91

(1988); *United States v. Polichemi*, 219 F.3d 698, 705-06 (7th Cir. 2000).

If a *Batson* error has been proven, however, *Rivera* confirmed that a different rule applies—one of automatic reversal. Before we can apply these rules to Winston's case, we must address two additional complications: first, the fact that it was his own lawyer who engaged in intentional discrimination in his jury strikes, and second, the fact that this case does not come to us on direct appeal. Normally, a defendant is bound by his lawyer's choices, because the lawyer acts as his agent. See *United States v. Boyd*, 86 F.3d 719, 722 (7th Cir. 1996). But, as *Boyd* recognized, the general rule is that when the lawyer's performance falls below the Sixth Amendment bar and the defendant is prejudiced by that weak performance, then the defendant is entitled to relief. Our task is to see how that rule of agency, the *Batson* rule, and the Sixth Amendment right to the effective assistance of counsel intersect.

## III

The governing state court opinion in this case was the one issued by the Wisconsin Court of Appeals in *Winston II*, see *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003), since the Wisconsin Supreme Court chose not to examine the intermediate court's decision. We limit ourselves to the record that was before the state court, and presume the findings of fact therein are correct. 28 U.S.C. § 2254(e)(1); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

A

As relevant here, *Winston II* disposed of Winston's claim in the following parts of the court's opinion:

¶ 12. Winston's third ineffective assistance claim involves trial counsel's alleged elimination of men from the jury. Winston contends that he was harshly judged by the jury in part because it consisted entirely of women. We reject that contention.

¶ 13. First, this same all female jury acquitted Winston of the sexual assault involving intercourse and convicted him only of the sexual assault involving contact. This result blunts Winston's contention. Second, appellate counsel declined to raise this claim on direct appeal because the trial counsel's strategic reason for favoring female jurors was his belief that they would be more critical of the victim than male jurors would be. That defense strategy was reasonable, and thus, "virtually unchallengable." *Strickland*, 466 U.S. at 690-91. Consequently, an ineffective assistance claim cannot be maintained on this basis.

*Winston II*, 2007 WL 586394 (citations and footnote omitted).

As we read this, the court offered two reasons for rejecting Winston's *Strickland* claim: first, it thought that the fact that the jury acquitted him on one count demonstrated that he was not prejudiced by his lawyer's conduct; and second, it assumed that the fact that the lawyer had a strategic reason for what he did was

enough to establish that his performance was not con-
stitutionally inadequate. The latter point was both a
finding of fact and a ratification of the lawyer's
conduct: Winston's counsel struck male jurors on the
basis of their gender because he believed that *all* men,
because they are men, would be unsympathetic to his
client's case. And indeed, the record bears out the fact
that this was the attorney's reasoning. He conceded
frankly that the "all-women jury resulted from his ac-
tions." At the time we heard oral argument in this case,
the parties debated whether an evidentiary hearing
would be appropriate for further factual development
on this issue. But since then, the Supreme Court
has spoken in a way that rules out that possibility for
a petitioner like Winston who is relying on 28 U.S.C.
§ 2254(d)(1). See *Pinholster*, 131 S. Ct. at 1398-1400.
Neither party suggests anything to rebut the presump-
tion that these facts are correct. 28 U.S.C. § 2254(e). Thus,
the sufficiency of the evidence used to discover coun-
sel's reasons for the strikes—whether it be in a letter or
a hearing before the state trial court—is not before us.


                                   B

   This brings us to the question whether Winston's
lawyer performed inadequately, as *Strickland* defines
that concept. In light of *Batson*, *Powers*, *McCollum*, and
*J.E.B.*, we conclude that the answer is yes. Deliberately
choosing to engage in conduct that the Supreme
Court has unequivocally banned is both professionally
irresponsible and well below the standard expected of

competent counsel. Whether the state court's conclusion to the contrary represented an unreasonable application of clearly established Supreme Court precedent is a more difficult question, as we explain below. Eight years before Winston's trial began, the Supreme Court had squarely held that intentional discrimination on the basis of gender was forbidden in peremptory challenges. *J.E.B., supra.* Indeed, even earlier, in 1992 *McCollum* explicitly removed "discrimination" from a long list of permissible reasons defense counsel might have for striking a prospective juror. See 505 U.S. at 58 ("[N]either the Sixth Amendment right [to effective assistance of counsel] nor the attorney-client privilege gives a criminal defendant the right to carry out through counsel an unlawful course of conduct."). Calling the lawyer's actions "strategic" does not help: as the Court has repeatedly stated, the *Batson* rule exists not only to protect the criminal defendant, but also to protect the prosecutor's interests, the interests of the prospective jurors, and society's interest in an unbiased system of justice. We may assume that defense counsel can waive the rights of his client, but he has no authority to waive the other rights implicated by *Batson.*

Intentionally violating the Constitution by discriminating against jurors on account of their sex is not consistent with, or reasonable under, "prevailing professional norms." *Strickland*, 466 U.S. at 688. To the contrary, Wisconsin forbids lawyers from engaging in unlawful representation. See WIS. RULES OF PROF'L CONDUCT, at Preamble ("A lawyer's conduct should conform to the requirements of the law."); *id.* at R. 3.1(a) ("In representing

a client, a lawyer shall not . . . knowingly advance a claim or defense that is unwarranted under existing law."). Professional rules typically prohibit lawyers from engaging in conduct prejudicial to the administration of justice. See, *e.g.*, MODEL RULES OF PROF'L CONDUCT R. 8.4(d) cmt.; ILL. RULES OF PROF'L CONDUCT R. 8.4(a)(5); MINN. RULES OF PROF'L CONDUCT R. 8.4(d); WASH. RULES OF PROF'L CONDUCT R. 8.4(d). Some states' provisions explicitly forbid lawyers from engaging in discrimination on the basis of race, sex, national origin, age, sexual orientation or socioeconomic status, and they specify that this prohibition applies to jurors. See, *e.g.*, FLA. RULES OF PROF'L CONDUCT R. 4-8.4(d); ILL. RULES OF PROF'L CONDUCT R. 8.4(a)(5); MINN. OF RULES OF PROF'L CONDUCT R. 8.4(g); N.J. RULES OF PROF'L CONDUCT R. 8.4(g); WASH. RULES OF PROF'L CONDUCT R. 8.4(g). Racist or sexist conduct can be the basis for professional sanction, censure, or even disbarment. See STEPHEN GILLERS, REGULATION OF LAWYERS: PROBLEMS OF LAW AND ETHICS 792-799 (8th ed. 2009). In light of these well-established professional norms, we have no trouble concluding that trial counsel's decision to strike jurors based solely upon their gender constituted deficient performance.

Troublingly, before this court Wisconsin has taken the position that "[d]efense lawyers often ignore, or even perpetrate, violations of their clients' constitutional rights in the hopes of gaining a strategic advantage." It insists that no Supreme Court precedent establishes that deficient performance occurs just because an "attorney exercises his professional judgment based on

the belief that gender differences may influence a jury's verdict in his client's favor." But that is not true. Quoting its earlier decision in *Nix v. Whiteside*, 475 U.S. 157, 166 (1986), the Supreme Court in *McCollum* held in a *Batson* case that "[d]efense counsel is limited to 'legitimate, lawful conduct.'" 505 U.S. at 57. We do not know where the state is getting its data from, but we hope that it is mistaken about the frequency of deliberate constitutional violations on the part of the defense bar. To the extent that such misconduct exists, we are certainly not going to give it our *imprimatur*. *Cf. J.E.B.*, 511 U.S. at 154 (Kennedy, J., concurring in the judgment) ("Nothing would be more pernicious to the jury system than for society to presume that persons of different backgrounds go to the jury room to voice prejudice."). (For the record, we would say the same thing about a defense lawyer who tried to gain an advantage for her client by bribing the judge, or by suborning perjury, or in any other plainly unlawful way.) We conclude, in summary, that Winston's lawyer's performance was constitutionally inadequate. Ordinarily we would need to move on to the question whether the Supreme Court of the United States had clearly established this proposition by the time the state courts acted. In this case, however, we have no need to undertake that inquiry, because of our conclusion on the prejudice branch of the *Strickland* inquiry, to which we now turn.

C

Winston cannot prevail unless he can also show that he was prejudiced by his lawyer's ineffective perfor-

mance. And here we encounter a problem: while a direct *Batson* claim would be viewed as a structural error and thus not subject to a harmless-error rule, a *Strickland* argument requires an examination of prejudice. But the Supreme Court has said that structural errors fall within "a limited class of fundamental constitutional errors that defy analysis by harmless error standards." *Neder*, 527 U.S. at 7 (internal quotation marks deleted). If, therefore, analysis is impossible for harmless-error purposes, then it is hard to see how it would be possible for purposes of *Strickland* prejudice—after all, prejudice is the central inquiry in a harmless error inquiry. But a closer look at *Neder* reveals that the Court was not so much dispensing with harmless error as it was finding that structural errors "are so intrinsically harmful as to require automatic reversal." *Id.* Translated into *Strickland*'s terms, it was saying that such errors inevitably "undermine[] confidence in the outcome" of a proceeding. 466 U.S. at 694.

The state's argument that *Winston II* adequately addressed prejudice under *Strickland* when it concluded that the result of the trial "blunts Winston's contention" that he was "harshly judged" by the all-female jury, 2007 WL 586394, at ¶ 12-13, does not come to grips with the consequences of *Hillery*, *Neder*, and *Strickland*. *Hillery* held that "when a petit jury has been selected upon improper criteria . . . we have required reversal of the conviction because the effect of the violation cannot be ascertained. . . . Like these fundamental flaws, which never have been thought harmless, discrimination in the grand jury undermines the structural integrity of the

criminal tribunal itself, and is not amenable to harmless-error review." 474 U.S. at 263-64. Prejudice, in other words, is automatically present when the selection of a petit jury has been infected with a violation of *Batson* or *J.E.B.*

## D

Even this, however, is not enough to allow Winston to prevail. All we have shown thus far is that the state court erred in its evaluation of Winston's *Strickland* claim. But as we acknowledged at the outset, more than error must be shown in order to obtain relief under section 2254. The state court's resolution must be so far out of bounds that it is objectively unreasonable. The question is therefore whether the state court transgressed that outer perimeter when it failed to see the link between the analysis of prejudice in the structural error cases and the analysis of prejudice in the *Strickland* line of cases. That link would have been apparent, we believe, if the state court had not made the error of assuming that lawyers are permitted intentionally to violate the Constitution when they represent criminal defendants. The Supreme Court, as we have explained above, has emphatically rejected that proposition.

Nevertheless, as the state points out, the Supreme Court has never spoken to exactly this set of facts. That alone is not enough to doom Winston's petition; *Williams v. Taylor* holds that an unreasonable application of law exists "if the state court either unreasonably extends a legal principle from our precedent to a new context

where it should not apply or unreasonably refuses to extend that principle to a *new context* where it should apply." 529 U.S. at 407 (emphasis added). In other words, where the legal principle compels a certain outcome, AEDPA does not require the facts to conform to "some nearly identical" pattern before relief is possible. *Panetti*, 551 U.S. at 953. We must therefore decide if the state courts here acted unreasonably, as *Williams* requires.

As we have already explained, the legal principle at stake here is the one calling for automatic reversal in response to proven *Batson* violations. It is true that Winston has not raised a direct *Batson* complaint (because the failing was that of his own lawyer); instead he complains of ineffective assistance of counsel. But rules of automatic reversal are not unknown in the Sixth Amendment context. *Strickland* itself teaches that there are times when prejudice is so likely that "case-by-case inquiry into prejudice is not worth the cost"—"prejudice is presumed." 466 U.S. at 692. Granted, instances of presumed prejudice are rare, but several are well established: when counsel is not present at a "critical stage" of a hearing, see *United States v. Cronic*, 466 U.S. 648 (1984), including situations where "counsel has entirely failed to function as the client's advocate," *Florida v. Nixon*, 543 U.S. 175, 190 (2004); when a defense lawyer has an actual conflict of interest, see *Cuyler v. Sullivan*, 446 U.S. 335 (1980); when a criminal defendant does not receive appointed counsel on direct appeal, see *Penson v. Ohio*, 488 U.S. 75 (1988), or when a non-*pro se* defendant is denied counsel of her choice, see *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). The same

result, in our view, must hold for *Batson* errors, in light of the Supreme Court's teachings in *Hillery* and the other cases we discussed earlier. Unconstitutional juror strikes, like other structural errors, create the kind of problem that "def[ies] analysis by harmless error standards." *Neder,* 527 U.S. at 7; see *Hillery*, 474 U.S. at 262.

If this is a strong message from the Supreme Court, however, it must yield to an even stronger command: when federal courts are applying section 2254, they must respect the line between applications of existing principles to new situations and extensions of the law. While we are persuaded that prejudice automatically flows from a deliberate *Batson* violation, we recognize that the Supreme Court of the United States had not yet taken this step at any point while Winston's case was before the Wisconsin courts. Indeed, our own decision in *Boyd* contains dicta that suggests that something like the *Martinez-Salazar* inquiry should apply here, 86 F.3d at 722. A division of authority in the lower courts provides some evidence that the matter has not yet been clearly established by the Supreme Court. And the lower courts were indeed divided on this point. See, *e.g.*, *Henderson v. La Marque*, 2002 WL 1034047, at *11 n.3 (N.D. Cal. May 15, 2002); compare *Boyd*, 86 F.3d 719 (requiring a defendant to demonstrate ineffective assistance for a *Batson-McCollum* violation), with *United States v. Huey*, 76 F.3d 638 (5th Cir. 1996) (granting a new trial, without any showing of ineffective assistance, for a proven *Batson-McCollum* violation). It was not until *Rivera,* decided over a decade after *Boyd* and *Huey* and two years after *Winston II*, that the Supreme Court explained

that a *Martinez-Salazar* problem is fundamentally different from a proven *Batson* violation. The former is amenable to harmless-error analysis, but the latter calls for automatic reversal. The *Martinez-Salazar* rule concerns peremptory challenges, which are merely "'a creature of statute'" and address a procedure to which a defendant has "no freestanding constitutional right." *Rivera*, 129 S. Ct. at 1454 (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)). By contrast, *Batson* cases are "automatic reversal precedents" because they "involve[] *constitutional* errors concerning the qualification of the jury." *Id.* at 1455.

But *Rivera* lay in the future at the time the Wisconsin courts acted. It was not outside the boundaries of reasonable differences of opinion, given the state of the law at the time, for those courts to predict that the Supreme Court would apply a harmless-error standard even to intentional *Batson* violations like the one committed by Winston's lawyer. We therefore AFFIRM the judgment of the district court denying Winston's section 2254 petition.