In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3868

MATTHEW HALE,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 94—**James T. Moody**, *Judge*.

ARGUED FEBRUARY 11, 2013—DECIDED MARCH 5, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Matthew Hale was the head of a group now known as the Creativity Movement. It used to call itself the World Church of the Creator but lost a trademark battle with an organization that had a senior claim to that name. See *TE-TA-MA Truth Foundation—Family of URI, Inc. v. World Church of the Creator*, 297 F.3d 662 (7th Cir. 2002). Hale then put out a

contract on the life of District Judge Lefkow, who entered the injunction implementing that decision. He was convicted of soliciting a crime of violence and obstructing justice. We affirmed. 448 F.3d 971 (7th Cir. 2006). A person sympathetic to the Creativity Movement has been convicted of threatening the life of the foreman of the jury that found Hale guilty. See *United States v. White*, 698 F.3d 1005 (7th Cir. 2012).

The Creativity Movement is racist. Its Five Fundamental Beliefs are:

> Based on the Eternal Laws of Nature, History, Logic and Common Sense we Creators believe:
>
> 1. WE BELIEVE that our Race is our Religion.
>
> 2. WE BELIEVE that the White Race is Nature's Finest.
>
> 3. WE BELIEVE that Racial Loyalty is the greatest of all honors, and racial treason is the worst of all crimes.
>
> 4. WE BELIEVE that what is good for the White Race is the highest virtue, and what is bad for the White Race is the ultimate sin.
>
> 5. WE BELIEVE that the one and only, true and revolutionary White Racial Religion— Creativity—is the only salvation for the White Race. To the fulfillment of these Religious Beliefs we Creators forever pledge our Lives, our Sacred Honor and our Religious Zeal.

The Movement's founder was Ben Klassen. According to his book *The White Man's Bible*, not only all non-whites

but also all Jews, Christians, and Muslims deserve contempt. Jews receive special opprobrium as the supposed masterminds of the white race's decay; Christians are censured for the religion's role in the decline of the Roman Empire (which the Movement treats as civilization's apex); all theistic religions are ridiculed for promoting what the Movement calls the "spook in the sky" fallacy (though the Romans worshipped gods). Medicine is seen as a Jewish hoax aimed at weakening the white race. The Movement's web site declares: "all medicines, drugs, narcotics and chemicals are poisonous and toxic to the human body". The legal profession is condemned as a bleeding-heart group that supports the weak, while the Movement favors the strong. Farmers are denounced for using fertilizer, which according to the Movement injures consumers. The web site states that food "must be uncooked, unprocessed, unpreserved and not tampered with in any other way. This further means it must be organically grown, without the use of chemicals."

Although the Movement declares itself non-violent (with this proviso: "we take deliberate care that the misfits are culled"), the jury found that Hale planned violence. He contends in this proceeding under 28 U.S.C. §2255 that the convictions should be set aside. The district court held, however, that no constitutional error occurred and denied Hale's petition. 2010 U.S. Dist. LEXIS 73604 (N.D. Ill. July 22, 2010), reconsideration denied, 2011 U.S. Dist. LEXIS 124657 (N.D. Ill. Oct. 27, 2011). The district court's opinions comprehensively address Hale's contentions. We add only a few thoughts about his principal appellate arguments.

Chief among them is a contention that the trial judge violated the Constitution by excluding Hale from the portion of the jury selection that dealt with pretrial publicity—a potentially sensitive subject, because Hale had praised Benjamin Smith, who in 1999 shot at least 11 members of minority groups. Hale's support of Smith had been noted in the press. It was essential to learn whether members of the venire could distinguish Smith's crimes from the charges against Hale and also put aside anything they may have heard or read about Hale himself. Both the judge and Hale's lawyer believed that these inquiries would be more fruitful if made outside of Hale's presence.

The judge called members of the venire into a small conference room and questioned them one at a time, thinking that this setting would promote candid answers—and ensure that an answer disclosing something prejudicial would not taint the rest of the venire. Hale did not protest, but neither did he formally consent on the record. We held in *United States v. Rodriguez*, 67 F.3d 1312, 1316 (7th Cir. 1995), that consent to questioning the venire outside the accused's presence is not one of the steps a lawyer can take on his client's behalf. Personal consent is essential. Hale maintains that this means express consent, directly to the judge, and that consent cannot be inferred from his conduct or anything counsel says.

During jury selection, the judge asked Hale's lawyer whether his client agreed to questioning outside his presence. His lawyer said: "Mr. Hale had asked whether

I thought he should come here. I said I would report back. I said I thought it okay if he was not here." The judge took this as conveying Hale's consent. Hale now contends that the judge was mistaken. We need not decide, because Hale defaulted that contention and cannot present it on collateral attack unless he shows both cause and prejudice. See *Engle v. Isaac*, 456 U.S. 107 (1982); *United States v. Frady*, 456 U.S. 152 (1982).

The argument has been doubly defaulted. First, Hale did not protest even though he knew exactly what was happening. He sat in the courtroom while the judge and the lawyers were in the conference room, to which members of the venire were called one at a time. Hale, a law-school graduate, was not shy about telling the judge that he disagreed with one or another step that his lawyer had taken. Yet he said nothing about questioning jurors outside his presence. Had Hale raised the subject, the judge could have either obtained Hale's consent on the record or permitted him to observe all questioning. Either way, the issue that Hale now identifies could have been fixed before it became a problem. That's why courts require contemporaneous action.

The second default was failure to raise the issue on direct appeal. Because Hale knew what had occurred, any claim of error could and should have been presented on appeal. Hale had by then fired his lawyer and was representing himself. He contends that the lack of a transcript of what occurred in the conference room is "cause" for not raising the issue immediately. But why

was there no transcript? Only because Hale failed to order one. A person who elects to represent himself cannot contend that his own decisions vitiate the judgment. *Faretta v. California*, 422 U.S. 806, 834–35 n.46 (1975).

Hale's brief in this court tells us that he did not order that transcript because he thought that the proceeding had been sealed. If that's what he thought—though the district judge never said any such thing—he could have asked that the events be unsealed, or that a transcript be submitted to the court of appeals for review *in camera*. He made neither request, so he must accept responsibility. (Anyway, we don't see why, on Hale's view, a transcript was necessary. Hale maintains that only a formal consent given directly to the judge could have authorized the proceedings in the conference room. Yet Hale was never in that room, so the nonexistence of the kind of consent that Hale insists is essential could have been established using the transcript of the public proceedings.) The lawyer representing Hale in these collateral proceedings contends that "actual innocence" excuses the default, but that argument is hard to take seriously. The evidence recounted in our 2006 opinion supports the convictions. The evidence was contested at trial, to be sure, and the jury might have drawn inferences in Hale's favor, but it was not compelled to do so.

Hale's other principal contention is that, before taking over his own defense, he received ineffective assistance of counsel. He complains about almost everything counsel did or did not do. The district court analyzed each of the current lawyer's objections to his predecessor's performance. We discuss only two of them.

Trial counsel used all of the peremptory challenges allotted to the defense. Hale's current lawyer contends that he used them unwisely by striking white members of the venire rather than black members. Because black jurors may have held Hale's racist views against him, current counsel contends that his trial counsel should have used the peremptory challenges to remove as many black members of the venire as possible, and counsel's failure to do this violated the sixth amendment.

Yet the Supreme Court has held that lawyers are *forbidden* to exercise challenges on racial grounds. See *Batson v. Kentucky*, 476 U.S. 79 (1986). This rule applies to defense counsel as well as to prosecutors. See *Georgia v. McCollum*, 505 U.S. 42 (1992). Although defense lawyers are not state (or federal) actors, a judge's decision to honor a challenge is governmental and therefore must not implement racial discrimination. Far from holding that defense lawyers must defy *Batson* whenever evasion would be in the interest of the defense, we have held that racially motivated challenges constitute ineffective assistance, even when the lawyer sincerely believes that removing jurors of a particular race or sex would help the defendant. See *Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011). Hale's trial lawyer should be praised, not condemned, for resisting the temptation to use race as the basis of challenges.

On top of the impropriety of targeting blacks for challenge is the fact that singling them out would have done Hale little good. Many white members of the venire may have deemed Hale's beliefs repugnant. And the

Creativity Movement holds so many groups in derision—blacks, Asians, Latinos (the Movement calls darker-skinned persons "mud races"), Jews and all other adherents to theistic religions, physicians (and presumably nurses, pharmacists, and practitioners of related occupations), lawyers, farmers (other than organic farmers), food-service workers who handle goods that have been cooked or contain preservatives—that it would be impossible for defense counsel to strike even a small fraction of those in the jury pool whom Hale and his followers had denounced. The judge was not about to say to the assembled venire: "If you are not Nordic, or believe in God, or work in jobs related to food, medicine, or law, you are excused." Hale was entitled to trial by a fair cross-section of the whole community, not just that subset of the community that the Creativity Movement favors. Hale's hatred of blacks did not entitle him to an all-white jury.

The best hope for the defense was to identify persons who would not hold Hale's beliefs against him. The judge asked all members of the venire a series of questions, including: "The evidence in this case may show that the defendant has strong negative feelings and views about racial and religious minorities. Would that fact prevent you from impartially judging the facts of this case?" and "Have any of you or has anyone close to you ever been the victim of an offense motivated by race, gender, sexuality or religion or treated differently in your school or workplace based on any of those factors?" An affirmative answer to either of these, or a number of related questions, led to further exploration.

Answers could be, and were, used as the basis of both challenges for cause and peremptory challenges. Hale does not contend that his lawyer performed inadequately in proposing these questions to all potential jurors and following up on the answers. His current argument is limited to a contention that counsel should have exercised peremptory challenges on the basis of race alone. That argument cannot succeed, given *McCollum* and *Winston*.

Let us turn to a second of current counsel's complaints about trial counsel's performance. The prosecution's theory was that Hale told Tony Evola, the Movement's "head of security," to kill Judge Lefkow. Hale's lawyer advanced two principal responses: first, that Evola misunderstood him, and that far from urging Evola to kill the judge he had told Evola to comply with all state and federal laws; second, that if he *did* tell Evola to kill the judge, he did so only at Evola's instigation and that he had been entrapped. These defenses were presented to the jury, which rejected them. Hale's current lawyer insists that these defenses were doomed and that trial counsel should have *conceded* that Hale told Evola to kill someone—but that the "someone" was not Judge Lefkow. According to Hale's current lawyer, Hale was using roundabout language to tell Evola to kill the principal lawyer for the plaintiff in the trademark suit.

Hale's trial lawyer made a choice among potential defenses. *Strickland v. Washington*, 466 U.S. 668, 690 (1984), tells us that a strategic choice, made after deliberation, is "virtually unchallengeable".

Trial counsel did not have much room for maneuver, and trying to show that Hale's ambiguous statements had been misunderstood was the best of the available choices. The approach that current counsel prefers—defending against a contract-murder charge by conceding that a hit had been contracted but disputing the identity of the target—was unlikely to appeal to jurors. More than that: If Hale had been acquitted after presenting such a defense, an indictment charging him with planning the murder of the TE-TA-MA Truth Foundation's lawyer would have been the prosecutor's next logical step. And in that follow-up case the prosecutor could have made hay out of the fact that Hale had effectively confessed. So the defense would not have seemed attractive; it could not have extricated Hale from his legal problems. Counsel did not render ineffective assistance by settling on the theory of defense.

The remaining arguments were carefully canvassed by the district court and do not require discussion here. The judgment is affirmed.