IN THE SUPREME COURT OF NORTH CAROLINA

No. 86A02-2

Filed 21 March 2025

STATE OF NORTH CAROLINA

v.

BRYAN CHRISTOPHER BELL


On writ of certiorari pursuant to N.C.G.S. §§ 7A-32(b) (2023) and 15A-1422(c)(3) (2023) to review an order denying defendant's post-conviction motion for appropriate relief filed on 12 May 2006 and amendment to motion for appropriate relief filed on 13 April 2012, entered on 13 December 2012 by Judge Charles H. Henry in Superior Court, Onslow County. Heard in the Supreme Court on 9 April 2024.

*Jeff Jackson, Attorney General, by Teresa M. Postell, Special Deputy Attorney General, for the State-appellee.*

*Dionne R. Gonder and Michael R. Ramos, for defendant-appellant.*

BARRINGER, Justice.

Defendant Bryan Christopher Bell was convicted of first-degree murder based on both the felony murder rule and premeditation, deliberation, and malice; first-degree kidnapping; and burning of personal property. Defendant was sentenced to death for the first-degree murder conviction. Defendant was sentenced to consecutive prison terms of 133 months to 169 months for the kidnapping conviction and eleven to fourteen months for the burning of personal property conviction. *State v. Bell,* 359

N.C. 1, 8–9 (2004), *cert. denied*, 544 U.S. 1052 (2005). Defendant filed a post-conviction motion for appropriate relief and an amendment thereto. Defendant contends that, because the prosecution engaged in gender-based discrimination during his trial, in violation of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), his conviction should be vacated and a new trial granted.

This Court recognizes the reprehensible and insidious nature of discrimination in the jury selection process. Given the great importance of this issue, this Court has considered, in depth, the discriminatory practices of the State in this case. However, in the faithful application of the laws of this State, this Court cannot ignore the blackletter, statutory, and procedural requirements of the law.

For the reasons set forth herein, we conclude that defendant's *J.E.B.* claim was not preserved for appellate review. Moreover, defendant's claim is also procedurally barred pursuant to N.C.G.S. § 15A-1419. We therefore affirm the judgment of the superior court as stated in the 13 December 2012 order denying defendant's motion for appropriate relief.

## I. Factual Background

### A. The Offenses

At trial, the evidence tended to show that on 3 January 2000, defendant, Antwaun Sims, and Chad Williams brutally murdered eighty-nine-year-old Elleze Kennedy by beating her and locking her in the trunk of her car, which defendant then set on fire. *Bell*, 359 N.C. at 9–11. Williams ultimately pleaded guilty to the crimes

and testified against defendant and Sims, who were tried together. *Id.* at 11.

Defendant, Sims, and Williams were together in Newton Grove, North Carolina on 3 January 2000. They visited a game room and then "hung out" at a traffic circle where they smoked marijuana and drank brandy. *Id.* at 9. Defendant told Sims and Williams that he wanted to steal a car so that he could leave town. Sims agreed to participate in defendant's plan. Defendant then saw Ms. Kennedy leaving a Hardee's restaurant and stated, "I want to rob the lady for her Cadillac." *Id.*

Defendant, Sims, and Williams followed Ms. Kennedy to her home. As Ms. Kennedy was getting out of her car and preparing to lock it, defendant rushed upon her, pointed a BB gun at her, and demanded the car keys. Ms. Kennedy threw the keys and began screaming. Defendant hit her with the gun, causing her to fall to the ground. After finding the keys, Sims and Williams forced Ms. Kennedy into her vehicle. Ms. Kennedy fought. She bit Williams, who responded by punching her in the face.

Defendant sat next to Ms. Kennedy in the back seat of her car. With Williams in the front passenger seat, Sims drove towards Bentonville Battleground. Ms. Kennedy asked defendant where they were taking her and why he was so mean. Defendant responded by pistol whipping Ms. Kennedy. By the time they arrived at Bentonville Battleground, Ms. Kennedy was unconscious. The three men pulled her from the back seat of her vehicle and shoved her into the trunk. The three men then

continued driving towards Benson with Ms. Kennedy in the trunk of the vehicle. *Id.* at 9–10.

Ms. Kennedy eventually awoke and began moving and making noise from the trunk. Defendant told Sims to turn up the radio so they could not hear her. Defendant, Sims, and Williams then drove to a trailer park community where Williams' cousin, Mark Snead, lived. The three men went inside Snead's trailer. After smoking marijuana, the three left Snead's residence and went to another trailer in the community. Before leaving the second trailer, Williams declared that he did not want to go anywhere in the car while Ms. Kennedy was in the trunk. Williams stayed at the trailer park when defendant and Sims drove off. A short while later, defendant and Sims returned. Ms. Kennedy was still in the trunk, but defendant and Sims told Williams that Ms. Kennedy had been released. Thinking Ms. Kennedy was out of the vehicle, Williams left in the car again with defendant and Sims. *Id.* at 10.

Sims drove the stolen vehicle towards Fayetteville. Along the way, the trio made two stops. During the first stop, they cleaned Ms. Kennedy's blood from the back seat. Then, they stopped a second time for fuel. Defendant rifled through Ms. Kennedy's purse, where he found four dollars to steal and use for gasoline. At this point, Williams heard movement in the trunk and realized Ms. Kennedy was still trapped inside. When Williams confronted defendant about his suspicions, defendant told Williams he was "tripping." Sims then drove the group the rest of the way to Fayetteville where he eventually stopped the car. Defendant and Sims got out of the

vehicle and opened the trunk. Sims repeatedly slammed the trunk lid on Ms. Kennedy as she tried to climb out of the trunk and escape. *Id.*

Next, Sims drove defendant and Williams back to Ms. Kennedy's home so defendant could look for the scope to his BB gun. The three did not find the scope, but did find Ms. Kennedy's shoe, which defendant put into the car. Williams again asked defendant and Sims to release Ms. Kennedy. They told Williams that they would release her in a different location. *Id.*

Sims drove Ms. Kennedy's car down a path before parking in a clearing where Sims opened the trunk. At trial, Williams testified that he could hear Ms. Kennedy moaning. When Williams asked defendant what he was going to do, defendant responded, "Man, I ain't trying to leave no witness. This lady done seen my face. I ain't trying to leave no witness." Defendant shut the trunk with Ms. Kennedy still inside, took a lighter from Sims, and set his coat on fire. Defendant tossed his burning coat into the car with Ms. Kennedy, still alive, locked in the trunk. *Id.* at 10–11.

The next morning, at defendant's behest, Sims went to check on Ms. Kennedy's car. Sims reported to defendant that the car was covered in smoke and Ms. Kennedy was dead in the trunk. Defendant called a friend, Ryan Simmons, to pick up defendant, Sims, and Williams. Simmons later drove the three men back to the vehicle, where defendant and Sims wiped fingerprints off the car. Simmons eventually transported the three men to the home of Sims' brother, where they stayed for the next several days. *Id.* at 11.

Ms. Kennedy's vehicle was discovered and reported to the sheriff's department. Upon investigation, law enforcement found Ms. Kenndy's body in the trunk. An autopsy revealed that the cause of death was not the multiple blunt force trauma injuries Ms. Kennedy had sustained. Rather, the cause of Ms. Kennedy's death was carbon monoxide poisoning directly resulting from the fire set by defendant. *Id.* at 11.

## B. Procedural History and Post-Conviction Proceedings

On 24 August 2001, upon being convicted by a jury for the first-degree murder of Ms. Kennedy, defendant was sentenced to death. *Id.* at 8. In 2001, defendant appealed his conviction to this Court for the first time. *Id.*

In his initial appeal, defendant alleged numerous *Batson* violations related to the striking of jurors during voir dire. One of the alleged *Batson* violations was directed at the removal of prospective juror Viola Morrow. Defendant asserted twenty-three other assignments of error, none of which alleged gender discrimination in violation of *J.E.B. See Bell*, 359 N.C. at 16–47. This Court upheld defendant's conviction and death sentence, concluding that defendant received a fair trial and capital sentencing hearing. The Supreme Court of the United States denied defendant's subsequent petition for writ of certiorari. *Bell v. North Carolina*, 544 U.S. 1052 (2005).

Defendant filed a motion for appropriate relief on 12 May 2006. This motion did not raise a *J.E.B.* claim. Defendant filed an amendment to the motion for appropriate relief (AMAR) on 13 April 2012 pursuant to N.C.G.S. § 15A-1415(g).

In his AMAR, defendant alleged—for the first time—that the State engaged in unconstitutional gender-based discrimination at his trial, requiring vacatur of his conviction and a new trial. Defendant centers his *J.E.B.* claim on the peremptory strike of Viola Morrow, a female prospective juror. The State filed an answer and request for summary denial.

Defendant's *J.E.B.* claim is based on an affidavit, filed on 9 January 2012 by Assistant District Attorney Gregory Butler, one of the State's prosecutors at defendant's murder trial. The affidavit was prepared by Butler in response to a Racial Justice Act claim by a defendant in an unrelated death penalty case. The affidavit provided race neutral reasons for the State's use of peremptory strikes in various death penalty trials, including defendant's.[1]

Pertinent to defendant's trial, the Butler affidavit contains the following information regarding prospective juror Morrow:

> Has 2 children age of [d]efendants. Has an illness rheumatoid arthritis. Can flare up at any time and incapacitate her. State had only used 12 of its 28 preempts and 10 jurors were seated, all female. State was looking for male jurors and potential foreperson. Was making a concerted effort to send male jurors to the [d]efense as they were taking off every male juror. Batson motion denied, no [prima facie] case but allowed state to give reason on the record.

---

[1] Notably, defendant also filed a motion for appropriate relief pursuant to the Racial Justice Act on 5 August 2010, which he amended on 30 August 2012. Defendant's Racial Justice Act motion for appropriate relief is not at issue before this Court now and remains before the superior court.

On 13 December 2012, the superior court entered an order summarily denying defendant's AMAR. Regarding defendant's *J.E.B.* claim, the superior court made a finding of fact that

> [a]lthough [defendant] objected to the prosecutor's peremptory challenge of Ms. Morrow based on her race pursuant to [*Batson*], there was never an objection alleging gender discrimination. The only objection during voir dire based on gender discrimination was raised by the prosecutor and was based on defendant's numerous peremptory challenges of men. The defense peremptorily challenged every man presented to them for questioning, except three.

The superior court concluded: "Since defendant was in a position to adequately raise this claim on direct appeal but failed to do so, this claim is procedurally barred from review pursuant to N.C.G.S. § 15A-1419(a)(3)."

On 18 January 2013, defendant moved that this Court hold in abeyance the time to file a petition for writ of certiorari. This Court allowed that motion on 24 January 2013. Defendant filed a Petition for Writ of Certiorari on 20 September 2019. This Court allowed that petition to consider the following issues:

> I. Whether defendant preserved his claim that the prosecutor impermissibly struck a juror on the basis of gender.
> II. If the claim is preserved, whether the trial court properly decided that there was no intentional gender discrimination, including whether the "dual motivation" standard applies.
> III. If the claim is preserved and the trial court erred, is the record sufficient to rule on the merits, or should the matter be remanded to the trial court for an evidentiary hearing.

On 8 February 2022, the State moved this Court to hold defendant's appeal in abeyance and remand defendant's case to the trial court for an evidentiary hearing regarding defendant's *J.E.B.* claim. The State's motion was allowed. In December 2022, the superior court in Onslow County conducted a joint evidentiary hearing for defendant and his co-defendant, Sims.

The remand court found that it was "more likely than not that the State's peremptory challenge of juror Viola Morrow was motivated in substantial part by a gender discriminatory intent." In making this determination, the remand court considered, *inter alia*, the following: statements made by the State's counsel during jury selection; the Butler affidavit; relevant history of the State's peremptory strikes in an unrelated capital case; a side-by-side comparison of juror Morrow who was struck and male prospective jurors who were passed by the State; and statistical evidence addressing the prosecutor's use of peremptory strikes, including a report by Dr. Frank Baumgartner which analyzed those statistics. *See State v. Tucker*, 385 N.C. 471, 510 (2023), *cert. denied*, 145 S. Ct. 196 (2024) (discussing evidence that may support a claim that a prosecutor's peremptory strikes were made on the basis of race); *see also J.E.B.*, 511 U.S. at 130, 144–45 (applying the *Batson* framework to evaluate claims of gender-based discrimination).

The remand court limited its review to the issue of defendant's and Sims' *J.E.B.* claims and did not re-address the procedural bar. However, the remand court did make additional findings of fact "establish[ing] the chronology and details of the

jury selection process." In doing so, the remand court noted, "from a review of the jury selection transcript, it is clear that the defendants never raised a gender-based *Batson* objection that the trial court could address."

After review of the voir dire transcript, the trial court made the following finding:

> In these ten rounds [of jury selection panels], twelve jurors were selected by the parties, ten females and two males. During this entire process, [sixty-nine] jurors were questioned with [sixteen] being excused for cause, three of whom were excused for cause after being passed by the State. During this process the State peremptorily removed [nineteen] jurors. At the end of this process the State had remaining [nine] peremptory challenges. Of the nineteen jurors removed peremptorily by the State, sixteen were females and three were males. The State had passed seventeen female jurors, ten of whom were selected to sit on the jury. The State passed twenty male jurors, three were removed for cause after they were passed by the State, and two of whom were eventually selected to sit on the jury. Fifteen of the twenty males were removed peremptorily by the defendants, ten by defendant Sims and five by defendant Bell.

In his briefing to this Court following its grant of certiorari, defendant argued that the trial court erred in concluding that his *J.E.B.* claim is procedurally barred under N.C.G.S. § 15A-1419(a)(3), because the Butler affidavit amounts to an admission by the State of violating the Equal Protection Clause and *J.E.B.* Without the affidavit, defendant argues, he would have "had no hope of making a viable showing [of his *J.E.B.* claim] . . . based upon the evidentiary record developed at trial." *State v. Hyman*, 371 N.C. 363, 384 (2018).

Defendant's argument hinges on the fact that, at the time of his initial appeal, Butler had not yet produced the affidavit. Without the Butler affidavit, defendant contends, the real reasoning behind the State's use of a peremptory strike on juror Morrow was unknown to defendant. Thus, defendant claims that he was not positioned to "adequately" raise the *J.E.B.* issue on his direct appeal and the procedural bar does not apply. N.C.G.S. § 15A-1419(a)(3) (2023).

**C. Voir Dire Proceedings**

On remand, the superior court made findings of fact, as detailed below, "establish[ing] the chronology and details of the jury selection process." The remand court concluded that "[t]he jury selection transcript reveals the State's concern about the defendants' peremptory challenges of male jurors."

Jury selection consisted of ten rounds of voir dire and an additional three rounds to select alternate jurors. Each round consisted of various panels of prospective jurors. During the first round of voir dire, a prospective male juror informed the trial court that he had plans to travel out of state. The court proposed that this prospective juror be placed in a later panel of prospective jurors, meaning he would not be called for voir dire until later in the process, after he had returned from his travel. Neither defendant objected to this plan. The State, however, urged the court instead to accommodate the prospective juror's travel plans by conducting his voir dire earlier as opposed to later. The State advised the court: "I'd like to have [a] few men. I would like to have a representative jury. There ain't no men." This

prospective juror was never called for voir dire.

In the third round of jury selection, the defendant and Sims raised two *Batson* objections after the State peremptorily struck two black female prospective jurors. The court denied both motions after finding that defendants had not established a prima facie case of racial discrimination. The State passed to the defendants two female and three male prospective jurors. Before any questioning by either defendant or Sims took place, Sims announced that he would like to peremptorily excuse two of the three male prospective jurors on the current panel. Accordingly, the State raised a *J.E.B.* objection, arguing that it was improper for either side to strike prospective jurors simply on the basis of their gender.

The State, perceiving that defendants were purposefully striking male jurors, argued that "all the men that have been passed to [the defense] have been challenged. Currently, we have passed three to them and one of them has been challenged before questioning has even begun." The State argued further: "[O]f the jurors currently seated, we've got seven, all of them are women . . . they have taken off all the . . . men." The remand court found that "it appear[ed] that the State wanted to put the defendants on notice of this observation and its complaint of gender discrimination."

In the fifth round of jury selection, the State exercised its peremptory strike to remove black female prospective juror Viola Morrow. Defendant centers his *J.E.B.* claim around this strike. Defendant and Sims raised a *Batson* objection to the State's peremptory strike of Morrow, which the court denied. No gender-based *J.E.B.*

-12-

objection was raised by defendant or Sims at trial.

The juror questionnaire completed by Morrow and contained in the record asked: "If you are selected to serve as a juror in this trial, is there any reason, physical . . . or otherwise which would or could distract or prevent you from giving your total and undivided attention to the trial of this matter . . . ?" Morrow responded: "I have rheumatoid arthritis . . . and it causes me to have a lot of pain. I feel it might distract me at times."

During her voir dire, Morrow explained that her rheumatoid arthritis had progressively worsened since her 1993 diagnosis. Butler asked: "[I]s it to the point that it incapacitates you to the point you have to stay home and everything?" Morrow replied affirmatively. Morrow explained that "flare ups . . . could be twice a week" or "twice in one day," and that she had spent the last two weeks in bed. At the conclusion of Morrow's voir dire, Butler stated to the court: "[I]n light of Ms. Morrow's medical situation and her concerns about that . . . the State would like to thank and excuse her for the purposes of this trial . . . we would excuse her and use a peremptory on her." When the State was later asked to put its reason for striking Morrow on the record, the prosecution replied, in part: "We have taken off . . . females because we felt like we needed more men on the jury."

The juror questionnaire completed by Morrow contains handwritten notes made by the prosecution. Those notes, produced during post-conviction discovery, state:

--2 children age of Δ's
--illness [rheumatoid arthritis can flare up at any time + incapacitate her]
--no man yet on panel, + we've already seated 10 jurors!

In contrast is the voir dire of male prospective juror Gary Northern, also conducted in the fifth round. Northern's questionnaire indicated that he had suffered a heart attack, resulting in his retirement. The following exchange took place during voir dire:

> Butler: The heart condition, would you feel that would cause you any difficulty in listening to the evidence and pay attention to all the evidence?
>
> Northern: There is no way I could tell. It depends on how intense -- if it gets to[o] intense, it might cause me to have stress.
>
> Butler: But, basically, for the most part you are able -- you can sit here and listen to the evidence and take the breaks that we take and do things?
>
> Northern: Yes, sir.
>
> Butler: If you have a problem, you understand that you just let the judge know and the bailiffs know and we would adjust and deal with that?
>
> Northern: Yes, sir.

The court interceded, asking follow-up questions which revealed that Northern takes daily medication, must see a doctor every three months, and that his heart only functions at about 20% capacity. Despite these health challenges, Northern was accepted by the State and passed to the defense. After questioning, defendant excused Northern.

The sixth round of voir dire included that of male prospective juror Johnnie Burris. On Burris' questionnaire, he indicated that he also had heart disease—a serious illness. Burris indicated that he was medically retired and taking heart and

blood pressure medication that could interfere with his mental competency. Burris further indicated that increased blood pressure caused by the trial could cause him physical harm. The following exchange took place:

> Butler: . . . you mention on your questionnaire that you have some stress heart problems and are on medication. Anything in particular about that that's beyond normal where you felt like you couldn't sit for an hour and a half at a time and would prevent you from being able to listen to the evidence?
>
> Burris: I really don't think so. Like I said, I am dealing with stress. I've had five heart surgeries and three heart attacks; so, you know, I'm a little concerned about my own health as well.
>
> Butler: I understand. Obviously, it's physically stressful in here. It is taxing. You've got to listen to the things that will be presented in court.
>
> Burris: Exactly.
>
> Butler: Do you feel like that you could -- if you have any medical problems, that you would let the [c]ourt know and things could be -- you could be accommodated and such if you were to sit as a juror?
>
> Burris: Yes.
>
> Butler: So I'm taking it then that even though you are on medication and things like that that you don't feel that would prevent you from being a fair and impartial juror or fairly considering the evidence and listen attentively to everything?
>
> Burris: Just like I told the judge the other day, I do not think it would interfere.
>
> Butler: I appreciate your concerns. If the situation got to where medically it's difficult, you would make the [c]ourt aware of that; is that right?
>
> Burris: Yes.

A bench conference was held after some further questioning. During the bench conference, the following exchange took place:

| Defense Counsel: | Could we ask the judge to inquire more about his health? |
|---|---|
| Butler: | That's fine with me. I don't mind if you want to do that or make a cause for challenge. If he doesn't allow the cause for challenge, I can either go on or you can tell me if you're going to do a peremptory on him. I don't have any problems if the judge wants to do that. |

The court removed Burris for cause, due to his health conditions.

## II.     Standard of Review

"When considering rulings on motions for appropriate relief, [this Court] review[s] the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Frogge*, 359 N.C. 228, 240 (2005) (extraneity omitted). We review issues of law de novo. *E.g.*, *State v. Biber*, 365 N.C. 162, 168 (2011).

## III.     Analysis

This Court allowed defendant's Petition for Writ of Certiorari on the following issues:

> I.     Whether defendant preserved his claim that the prosecutor impermissibly struck a juror on the basis of gender.
>
> II.     If the claim is preserved, whether the trial court properly decided that there was no intentional gender discrimination, including whether the "dual motivation" standard applies.
>
> III.     If the claim is preserved and the trial court erred, is the record sufficient to rule on the merits, or should

the matter be remanded to the trial court for an evidentiary hearing.

Accordingly, this Court first considers whether defendant has preserved his claim that the State deprived defendant of his Equal Protection rights by impermissibly striking a prospective juror due to her gender, in violation of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). We hold that defendant failed to preserve his *J.E.B.* claim.

Constitutional matters—including claims of gender discrimination during jury selection—"not raised and passed upon at trial will not be reviewed for the first time on appeal." *State v. Garcia*, 358 N.C. 382, 410 (2004*)* (extraneity omitted), *cert. denied*, 543 U.S. 1156 (2005); *accord State v. Best*, 342 N.C. 502, 513, *cert. denied*, 519 U.S. 878 (1996). Despite multiple statements by the State—in open court—that indicated the State's gender-based motives for striking potential jurors, neither defendant nor Sims made a gender-based discrimination objection at the time of jury selection. When the State was asked to put the reason for striking Morrow on the record, the State said: "We have taken off . . . females because we felt like we needed more men on the jury." Neither defendant nor Sims made a gender-based objection then, either.

The State also made the following statements during voir dire: "I'd like to have [a] few men. I would like to have a representative jury. There ain't no men"; "we have nothing but seven white women—seven women on the jury now, and we are entitled to have a jury that's representative of the community"; and "of the jurors seated

currently, we've got seven, all of them are women . . . . they have taken off all the . . . men." Neither defendant nor Sims raised a gender-based objection when any of these statements were made by the State or at any point during voir dire. Furthermore, neither defendant nor Sims raised the issue in their initial appeal. Therefore, defendant's claim is not preserved.

Moreover, assuming arguendo that defendant's *J.E.B.* claim is preserved, this Court is prohibited from allowing defendant's AMAR, because defendant's and Sims' gender-based claim of discrimination is procedurally barred and defendant has not demonstrated an exception to that bar. *See* N.C.G.S. § 15A-1419(b) (2023).

Under North Carolina law, this Court "shall deny," *id.*, review of a motion for appropriate relief when "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so," N.C.G.S. § 15A-1419(a)(3). *See also Tucker*, 385 N.C. at 514 (affirming the denial of a defendant's MAR for review of a *Batson* claim, because it was procedurally barred and the defendant had not demonstrated an exception to that bar). This statute "requires the reviewing court . . . 'to determine whether the particular claim at issue *could* have been brought on direct review.'" *Tucker*, 385 N.C. at 492 (quoting *Hyman*, 371 N.C. at 383 (emphasis added)). For this Court to determine that a claim could have been brought on direct review, "the direct appeal record must have contained sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question."

*Hyman*, 371 N.C. at 383. The procedural bar may be waived when a defendant shows, "by a preponderance of the evidence," that there is "[g]ood cause for excusing the" procedural bar *and* "actual prejudice," N.C.G.S. § 15A-1419(b)(1), *or* that "failure to consider the defendant's claim will result in a fundamental miscarriage of justice," N.C.G.S. § 15A-1419(b)(2). *See also Tucker*, 385 N.C. at 485.

Defendant argues that the MAR court erred in concluding that his *J.E.B.* claim was procedurally barred, because without the Butler affidavit, filed in 2012, defendant was not in a position to "adequately" raise the *J.E.B.* claim in his 2001 appeal. N.C.G.S. § 15A-1419(a)(3). Phrased another way, defendant contends that, without the Butler affidavit, the record did not "contain[ ] sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question." *Hyman*, 371 N.C. at 383. We disagree.

To show gender discrimination in jury selection, a defendant may rely on a variety of evidence. *See Tucker,* 385 N.C. at 510 (referencing evidence that may support a claim that a prosecutor's peremptory strikes were made on the basis of race); *see also J.E.B.*, 511 U.S. at 130, 144–45 (applying the *Batson* framework to evaluate claims of gender-based discrimination). Here, as previously discussed, the prosecutor made numerous statements about the State's desire to have men on the jury. This is direct evidence of the prosecutor's intent. Beyond the direct evidence, defendant may have relied on additional evidence that includes statistical evidence

about the prosecutor's use of peremptory strikes based on gender, side-by-side comparisons of female prospective jurors who were struck and male prospective jurors who were not struck in the case, and other relevant circumstances that bear upon the issue of gender discrimination. *See Tucker*, 385 N.C. at 510; *J.E.B.*, 511 U.S. at 144–45.

## A. Direct Evidence

The jury selection transcript reveals pointed statements baldly communicated by the State—in open court—that it wanted to place more men on the jury at the expense of seating women. When asked to put its reason for striking Morrow on the record, the prosecution replied, in part: "We have taken off . . . females because we felt like we needed more men on the jury." This statement confirms, as expressed in the Butler affidavit, that the State was "making a concerted effort to send male jurors to the [d]efense." Additionally, when the court suggested moving a prospective male juror to a later voir dire panel, the prosecution stated, "I mean, I'd like to have [a] few men. I would like to have a representative jury. There ain't no men. . . . I know I want a representative jury." With this statement, the State revealed its objective to "[look] for male jurors"—the same objective expressed in the Butler affidavit.

The transcript also reflects that the State raised a *J.E.B.* objection to both defendants' striking of prospective male jurors, stating, "all the men that have been passed to [defendant and Sims] have been challenged. Currently, we have passed three to them and one of them has been challenged before questioning has even been

done." The State's decision to raise a *J.E.B.* objection at trial presumably put defendant on notice that the gender of the jurors was a matter of interest to the State. Indeed, the remand court found that "[i]t appear[ed] that the State wanted to put the defendants on notice of this observation and its complaint of gender discrimination."

While arguing its *J.E.B.* objection, the State vocalized its dissatisfaction with the number of women that had been seated, stating that all "of the jurors seated . . . seven, all of them [were] women." The State reemphasized its dissatisfaction with an all-female jury, stating, "we have nothing but seven white women—seven women on the jury now, and we are entitled to have a jury that's representative of the community." Again, these statements—made in open court and captured in the record—reflect the State's dissatisfaction with an all-female jury, precipitating its "concerted effort to send male jurors to the [d]efense" as stated in the Butler affidavit.

The portion of the Butler affidavit pertaining to the State's peremptory strike of Morrow contains the following:

> Has 2 children age of [d]efendants. Has an illness rheumatoid arthritis. Can flare up at any time and incapacitate her. State has only used 12 of its 28 preempts and 10 jurors were seated, all female. State was looking for male jurors and potential foreperson. Was making a concerted effort to send male jurors to the [d]efense as they were taking off every male juror. Batson motion denied, no [prima facie] case but allowed state to give reason on the record.

The additional statements contained in the Butler affidavit, beyond those facts that could be gleaned from the transcripts available on appeal are: "State was looking

for male jurors and potential foreperson. Was making a concerted effort to send male jurors to the [d]efense." This language in the Butler affidavit is a summary of the statements made by the prosecution throughout voir dire. The additional statements in the Butler affidavit are not new facts absent from the record. Rather, they are the conclusion one would draw from the record as a whole and then argue in support of a *J.E.B.* claim on appeal.[2]

## B. Statistical Evidence

In combination, the transcripts and questionnaires provide the basis for a statistical analysis of the State's use of peremptory strikes based on gender. This determination is exemplified by defendant's own expert, Dr. Frank Baumgartner, who was tendered by defendant at the evidentiary hearing on remand.

Dr. Baumgartner reviewed data derived from the jury questionnaires and the transcript. Based on this portion of the record, Dr. Baumgartner determined that, of the ninety-three jury venire members, fifty-two were female and forty-one were male. Of the entirety, eleven females and eleven males were struck for cause, leaving forty-one females and thirty males. The State used twenty-four peremptory strikes: twenty

---

[2] Likewise, the handwritten note on Morrow's jury questionnaire, produced during post-conviction discovery, while not available for the direct appeal, is not now new evidence. The words "no man on panel, + we've already seated 10 jurors!" is simply reflective of statements made by the prosecution throughout voir dire. Indeed, on remand, the trial court found that "[t]he thinking and rationale expressed in Butler's affidavit regarding the peremptory charge of Morrow is also reflected in, and consistent with, the handwritten comments that appear on Viola Morrow's questionnaire obtained by the defendants in discovery."

for females and four for males. The analysis of the record, performed by defendant's expert, shows that the State used 83% of its peremptory strikes to remove females—a statistically significant percentage. Dr. Baumgartner analyzed numbers and information extracted *from the record* to conclude that the State made a statistically significant effort to remove female jurors. Dr. Baumgartner did not rely on, analyze, or utilize the Butler affidavit in his analysis. Therefore, it is apparent that the Butler affidavit is not required to perform a statistical analysis of the State's use of peremptory strikes.

## C. Side-by-Side Comparison

Comparison of female jurors who were struck to male jurors who were not struck is an important consideration in determining whether gender-based discrimination has occurred. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). The jury questionnaires and voir dire transcript allow comparison of Morrow with the male jurors who were permitted to serve. In particular, the transcripts allow for comparison of Morrow with prospective jurors Northern and Burris.

Voir dire questioning revealed that both Morrow and Northern could experience days when, due to their respective medical conditions, they would be unable to give their undivided attention to the trial. Morrow was asked directly if her health would interfere with her physical ability to sit on the jury. Burris, however, despite his serious health concerns, was not directly asked the same question. Morrow was offered no assurances of accommodation for any medical issues; however,

both Northern and Burris were. The State accepted and passed Northern to the defense despite his serious health issues. Similarly, the State indicated at the bench conference that it would accept Burris, despite his serious health issues. The disparate treatment and questioning between female Morrow and males Northern and Burris are reflected in the transcripts contained in the record, which were available to defendant in preparing his appeal.

On remand, the reviewing court made "factual and legal determinations," *see Hyman*, 371 N.C. at 383, based on the transcript, that "[t]his disparity is evidence tending to prove purposeful discrimination." The Butler affidavit was not used to assess disparate treatment between prospective jurors.

In summary, the record contains the facts required to perform a statistical analysis of the State's use of peremptory strikes by gender. The record also contains the facts required to compare juror Morrow to males for whom the State did not use a peremptory strike. Most striking, the jury selection transcript captures statements—made in open court—conveying the State's desire to have more men on the jury at the expense of seating additional women jurors.

Clearly, the record contained "sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question" without the Butler affidavit. *Hyman*, 371 N.C. at 383. Therefore, the trial court was correct to conclude that, even without the Butler affidavit, defendant was in a position to adequately raise this claim on direct appeal

but failed to do so. Thus, defendant's *J.E.B.* claim is procedurally barred from review pursuant to N.C.G.S. § 15A-1419(a)(3). *See Tucker*, 385 N.C. at 492.

## IV. Exceptions to the Mandatory Procedural Bar

This mandatory procedural bar may be overcome in two scenarios. First, the bar may be overcome where a defendant shows "[g]ood cause for excusing" the defendant's failure to raise the claim on direct appeal and "demonstrate[s] actual prejudice." N.C.G.S. § 15A-1419(b)(1); *see also Tucker*, 385 N.C. at 485. Second, the bar may be overcome when a defendant shows "[t]hat failure to consider the defendant's claim will result in a fundamental miscarriage of justice." N.C.G.S. § 15A-1419(b)(2); *see also Tucker*, 385 N.C. at 485.

Defendant makes no argument that failure to consider his *J.E.B.* claim will result in a fundamental miscarriage of justice. Therefore, we limit our analysis to "good cause." Under subsection 15A-1419(c):

> [G]ood cause may only be shown if the defendant establishes by a preponderance of the evidence that his failure to raise the claim or file a timely motion was:
> (1) The result of State action in violation of the United States Constitution or the North Carolina Constitution including ineffective assistance of trial or appellate counsel;
> (2) The result of the recognition of a new federal or State right which is retroactively applicable; or
> (3) Based on a factual predicate that could not have been discovered through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction review.

N.C.G.S. § 15A-1419(c); *see also Tucker*, 385 N.C. at 485.

Defendant has failed to show good cause. Defendant first argues that, under subsection (c)(1), the State acted by withholding its true reasoning for striking Morrow from the jury, thereby preventing defendant's trial counsel and the trial court from ensuring the jury was selected without discrimination. Defendant also argues that, under subsection (c)(3), the Butler affidavit is new evidence of the State's motivation for the strike "that could not have been discovered through the exercise of reasonable diligence." Both of these arguments fail.

First, the record does not comport with defendant's view that the State's failure to confess discrimination at trial prevented defendant from raising his *J.E.B.* claim on his initial appeal. To the contrary, the prosecutors made statements in open court conveying the very information contained in the Butler affidavit. Specifically, the prosecutor stated on the record: "We have taken off . . . females because we felt like we needed more men on the jury"; "I'd like to have [a] few men. I would like to have a representative jury. There ain't no men"; "[w]e have nothing but seven white women—seven women on the jury now, and we are entitled to have a jury that's representative of the community"; and finally, "[o]f the jurors currently seated, we've got seven, all of them are women . . . they have taken off all the . . . men." It was no secret or surprise that the State was striking female jurors in an attempt to secure more male jurors.

Second, the Butler affidavit is not "a factual predicate that could not have been discovered through the exercise of reasonable diligence." N.C.G.S. § 15A-1419(c)(3);

*see also Tucker*, 385 N.C. at 485. A predicate fact is "[a] fact from which a presumption or inference arises." *Predicate fact, Black's Law Dictionary* (11th ed. 2019). The affidavit states: "State was looking for male jurors and potential foreperson. Was making a concerted effort to send male jurors to the [d]efense as they were taking off every male juror." The applicable inference in play here is that the State was surreptitiously striking female jurors in order to seat more male jurors. However, when asked to put its reasons on the record for striking Morrow, the State admitted, "We have taken off . . . females because we felt like we needed more men on the jury."[3]

It is evident from the cold record that the remarks made by the State during voir dire put defendant on notice that he needed to raise a *J.E.B.* objection. Thus, the Butler affidavit did not provide a factual predicate that could not have been discovered by analyzing the cold record. This Court need not reach the issue of whether defendant can demonstrate actual prejudice as required under N.C.G.S. § 15A-1419(b)(1), because defendant has failed to show good cause.[4]

This Court holds that defendant failed to preserve his *J.E.B.* claim, because

---

[3] The State also made the following statements during voir dire: "I'd like to have [a] few men. I would like to have a representative jury. There ain't no men"; "we have nothing but seven white women—seven women on the jury now, and we are entitled to have a jury that's representative of the community"; and "of the jurors currently seated, we've got seven, all of them are women . . . . they have taken off all the . . . men."

[4] The concurrence argues that the apparently incompetent lawyering should qualify defendant for the good cause exception. To pursue such a claim, defendant may file a motion for appropriate relief alleging ineffective assistance of counsel. *See* N.C.G.S. § 15A-1415(b)(3). This procedure would allow the reviewing court the opportunity to make the factual and legal determinations necessary to appropriately evaluate his claim. This would produce a record reviewable by this Court on appeal. *See* N.C.G.S. § 15A-1415(e); *but cf. Hyman*, 371 N.C. 383.

defendant failed to make a *J.E.B.* objection at trial. Moreover, assuming arguendo that defendant's claim is preserved, the claim is nevertheless not reviewable because defendant failed to raise the issue on direct appeal. Defendant's *J.E.B.* claim—raised for the first time in his Amendment to Motion for Appropriate Relief—is procedurally barred pursuant to N.C.G.S. § 15A-1419(a)(3). This Court further holds that defendant has failed to meet his burden to show good cause in order to overcome the Smandatory procedural bar. Accordingly, the remaining two issues for which certiorari was allowed are moot.

## V.    Conclusion

Nothing in this opinion commends the defense's practice of systematically eliminating men from the jury. Discrimination in jury selection by either the State or the defendant is equally reprehensible. Without discrimination, the jury selection process should result in a "jury of one's peers," reflective of the community. "Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings." *J.E.B.*, 511 U.S. at 140. "Discriminatory use of peremptory challenges may create the impression that the judicial system has acquiesced in suppressing full participation by one gender or that the deck has been stacked in favor of one side." *Id.* (extraneity omitted).

This Court recognizes the reprehensible and insidious nature of discrimination in the jury selection process. Given the great importance of this issue, this Court has considered, in depth, the discriminatory practices of the State in this case. The concurrence contends that this Court constructs barriers to deny defendant any remedy. Yet, the concurrence acknowledges that denial of defendant's claim is required by law. Accordingly, in the faithful application of the laws of this State, this Court cannot ignore the blackletter, statutory, and procedural requirements of the law.

"The post-conviction procedure set forth [in N.C.G.S. § 15A-1419] serves a critical role in our criminal justice system. Not only does it provide for review and potential relief to defendants convicted of a crime, but the process also promotes finality. It is imperative, not only for the parties, but also for federal habeas review, that we strictly and regularly follow our post-conviction procedural requirements." *Tucker*, 385 N.C. at 486 (citations omitted). "[P]reservation . . . serves crucial functions in our justice system. . . . When a party alerts the trial court of a potential error, the court can correct it." *State v. Reber*, 386 N.C. 153, 157 (2024). An objection at trial is critical. The outcome of this case emphasizes the importance of preservation—not only for the defendant, but for the sake of the Constitution.

Defendant failed to raise a *J.E.B.* objection during jury selection and "was in a position to adequately raise" a *J.E.B.* claim on direct appeal. N.C.G.S. § 15A-1419(a)(3). Accordingly, defendant's *J.E.B.* claim is not preserved and is procedurally

barred under N.C.G.S. § 15A-1419(a)(3). Accordingly, we affirm the superior court's

13 December 2012 order denying defendant's amended motion for appropriate relief.

AFFIRMED.

Justice EARLS concurring in the result only.

The majority invokes the rampant evidence of unconstitutional gender discrimination by the State during jury selection to justify rejecting a defendant's challenge to unconstitutional gender discrimination by the State. That is just one clear indication of the failure of the *Batson* and *J.E.B.* frameworks to address the constitutional violation first acknowledged by the Supreme Court of the United States in *Strauder v. West Virginia*, 100 U.S. 303, 310 (1880).

I concur in the result only, because I cannot discern what Bell or his counsel could have done differently to achieve relief under our precedent, even in this extraordinary instance where a prosecutor has admitted under oath that he struck a juror based on her gender. In my view the jurisprudence of this state has effectively overruled *Batson* and *J.E.B.* for post-conviction relief even before today's decision. Until that precedent is overturned or superseded by statute, I am constrained to follow it. Our jurisprudence is wrong on this front, and it is our Court's responsibility to champion new pathways forward that will enforce the constitutional rights and safeguards of equal, impartial justice.

## I.   North Carolina's History of Jury Discrimination Claims

Striking a prospective juror on the basis of their race or gender violates the Equal Protection guarantee of the Fourteenth Amendment. *See generally Batson v. Kentucky*, 476 U.S. 79 (1986); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). This prohibition is rooted in the criminal defendant's constitutional right to be tried by a jury of their peers and to be sure that no group of peers is "systematically and

-31-

arbitrarily excluded from the jury pool which is to decide [a defendant's] guilt or innocence." *State v. Blakeney*, 352 N.C. 287, 296 (2000) (cleaned up). It also safeguards a defendant's constitutional right to an impartial jury. *See Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 237 (2005). A right to be judged by one's peers secures the People's voice in our justice system and operates as a "necessary check on governmental power." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 210 (2017); *accord Duncan v. Louisiana*, 391 U.S. 145, 156 (1968) ("[T]he jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.").

*Batson* and *J.E.B.* safeguards are also rooted in the individual citizen's right not to be excluded from a sacred civic duty because of their race or gender. Barbara D. Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It Anyway?*, 92 Colum. L. Rev. 725, 726 (1992) (citing *Batson*, 476 U.S. at 85–87). Aside from voting, jury service is the "most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019). It embodies the essential principle of democracy and self-government that "the law comes from the people." *Pena-Rodriguez*, 580 U.S. at 210.

Thus discrimination in jury selection "undermine[s] public confidence in the fairness of our system of justice" and harms the entire community. *Batson*, 476 U.S. at 87. It inflicts a "profound personal humiliation" on the excluded jurors. *Powers v.*

*Ohio*, 499 U.S. 400, 425 (1991). The State effectively labels those excluded jurors as "inferior" and unworthy to mete out justice. *See Strauder*, 100 U.S. at 308 (explaining that discriminatory exclusion is a "brand upon [the excluded jurors], affixed by the law, an assertion of their inferiority"). So great is the collective harm that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (cleaned up) (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

Since 1986, courts have employed a three-step process to determine whether a peremptory strike of a juror was "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2238; *J.E.B.*, 511 U.S. at 145 (applying *Batson*'s three steps to gender discrimination claims). At step one, the defendant must make a prima facie showing that the prosecution struck a juror based on gender based on a range of evidence—patterns in the prosecution's strikes, comparisons between how male and female jurors were treated, statements by the prosecutor, or anything else that might support an inference of discrimination. *State v. Clegg*, 380 N.C. 127, 130 (2022); *State v. Hobbs*, 374 N.C. 345, 350 (2020); *Miller-El II*, 545 U.S. at 240.

If the defendant clears that low bar, he "transfer[s] the burden of production to the State." *Hobbs*, 374 N.C. at 350. This is step two. At this stage, the prosecution must explain its peremptory challenges in non-discriminatory terms. *Clegg*, 380 N.C. at 130. The explanation need not be the full one. *State v. Fair*, 354 N.C. 131, 140 (2001).

At step three, the trial court must determine whether the defendant has carried his "burden of showing purposeful discrimination." *Hobbs*, 374 N.C. at 353. The judge considers the prosecutor's non-discriminatory explanations "in light of all of the relevant facts and circumstances," including "the arguments of the parties." *Id.* (quoting *Flowers*, 139 S. Ct. at 2243). The trial court must weigh all the evidence and decide whether the challenged strike was "motivated in substantial part by discriminatory intent." *Id.* (quoting *Flowers*, 139 S. Ct. at 2244). If the court decides the challenged strike was so motivated, the trial court has discretion to either dismiss the venire and start again, or to seat the improperly struck juror. *State v. McCollum*, 334 N.C. 208, 235–36 (1993).

Yet on appeal, these three steps have virtually never identified any instance of a discriminatory motive in the decision to use a peremptory challenge to strike a juror in North Carolina. Between 1986 and 2016, North Carolina's appellate courts collectively decided 114 *Batson* challenges on the merits. Daniel R. Pollitt & Brittany P. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate* Batson *Record*, 94 N.C. L. Rev. 1957, 1957 (2016). But they did not find a single violation where a prosecutor articulated a race-neutral reason for striking the juror. *Id.* These cases include seventy-four decided by our Court during that period. *Id.* at 1961–62.

North Carolina is an outlier even among southeastern states. During the same period, the highest state courts of bordering states found multiple *Batson* violations:

three in Virginia, and eleven in South Carolina. *Id.* at 1984.[1]

*Batson* challenges have fared little better at our Court since 2016. This Court rejected recent *Batson* challenges in *State v. Campbell*, 384 N.C. 126 (2023), *State v. Richardson*, 385 N.C. 101 (2023), and *State v. Tucker*, 385 N.C. 471 (2023). We found one, and only one, substantive *Batson* violation in *State v. Clegg*, 380 N.C. 127 (2022). We remanded for reconsideration of the matter in *State v. Hobbs*, 374 N.C. 345 (2020), and for further consideration in *State v. Bennett*, 374 N.C. 579 (2020).

The lack of successful *Batson* claims is not because discrimination is magically absent from North Carolina's legal system. Just the opposite. Studies examining state-wide jury data show that prosecutors struck Black jurors twice as frequently as their white counterparts. *See* Ronald F. Wright et al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 Ill. L. Rev. 1407 (2018) (analyzing data on more than 29,000 potential North Carolina jurors in noncapital felony trials between 2011–2012 and finding that prosecutors struck Black jurors twice as often as white ones).

*J.E.B.* claims alleging gender discrimination in jury selection have been similarly unsuccessful. The Court rejected such claims against the State in cases like

---

[1] Canvasing the South, North Carolina is an extreme outlier. From 2010 to 2017, "Alabama had over eighty appellate reversals because of racially-tainted jury selection." *See* James E. Coleman, Jr. & David C. Weiss, *The Role of Race in Jury Selection: A Review of North Carolina Appellate Decisions*, The North Carolina State Bar Journal, Fall 2017, at 13, 14. Florida had thirty-three. *Id.* Louisiana had twelve. *Id.* Mississippi and Arkansas saw ten each. *Id.* And in Georgia, the number was eight. *Id.*

*Richardson*, 385 N.C. at 193–94, *State v. Maness*, 363 N.C. 261, 276 (2009), *State v. Call*, 349 N.C. 382, 393 (1998), *State v. Gaines*, 345 N.C. 647, 669 (1997), *State v. Bates*, 343 N.C. 564, 595 (1996), and *State v. Best*, 342 N.C. 502, 513 (1996) (siding with the State on procedural grounds).

## II.   Bell's *J.E.B.* Claim

One possible exception to the drumbeat of rejection of *J.E.B.* claims was the predecessor to the case before us, *State v. Bell*, 380 N.C. 672 (2022), and its companion, *State v. Sims*, 373 N.C. 176 (2019), *rescinded* 384 N.C. 669 (2023). In these cases we remanded a *J.E.B.* challenge for an evidentiary hearing in superior court. On 23 January 2023, after receiving evidence, that court found that the State's peremptory strike of a juror, Viola Morrow, "was motivated in substantial part by her gender" in violation of *J.E.B.* It detailed its findings in a sixty-four-page order.

Significantly, the trial court relied on sworn testimony from a prosecutor in the case that he removed Ms. Morrow because he "[w]as making a concerted effort to send male jurors to the Defense." The same prosecutor admitted that, in another case, he struck prospective alternate juror Elizabeth Rich because he "was looking for strong male jurors" and wanted to "to get someone stronger" than Ms. Rich. He further admitted that he struck Brenda Corbett as a prospective juror because he wanted "strong unequivocal jurors and a potential foreman."[2] That sworn testimony as to the

---

[2] The prosecutor, assistant district attorney Greg Butler, had prepared two affidavits—including one for the Bell/Sims case—for a large data analysis effort by Dr.

prosecutor's thoughts was, obviously, not available to the defendants at the time of their trial or their direct appeal.

Moreover, at Sims's and Bell's joint evidentiary hearing, Bell's attorneys submitted a copy of the jury questionnaire for Morrow, which the State had provided during post-conviction discovery in Bell's case. That is, the discovery that occurs *after* the trial and *after* direct appeal through post-conviction proceedings under N.C.G.S. § 15A-1415(f) (2023). This document contained handwritten notes in the margin, which stated:

- 2 children age of Δ's

- illness [rheumatoid arthri . . . can flare up at any time
+ incapacitate her]

- no man on panel, + we've already seated 10 jurors!

Whatever other evidence of gender discrimination in the State's use of peremptory strikes that existed during jury selection at Sims's and Bell's initial trial, the jury questionnaire notes and affidavit were new, conclusive admissions by the State that it employed a peremptory strike to remove a juror based on gender. That is a constitutional violation. *E.g.*, *United States v. Omoruyi*, 7 F.3d 880, 882 (9th Cir.

---

Joseph Katz. Dr. Katz asked prosecutors for their reasons for striking African American jurors in the 173 cases examined in a Michigan State University study on the Racial Justice Act. *See* Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overhwleming Importance of Race in Jury Selection in 173 Post-*Batson *North Carolina Capital Trials,* 97 Iowa L. Rev. 1531 (2012). It is noteworthy that the prosecutors invoked gender discrimination in an effort to assert that they were not engaged in racial discrimination, in a case where defense counsel repeatedly objected to perceived racial discrimination in the prosecutor's peremptory strikes.

1993) (finding a constitutional violation because "[t]here was an admission of purposeful gender discrimination" (cleaned up)); *McGee v. State*, 953 So. 2d 211, 214–15 (Miss. 2007) (finding a violation of the Equal Protection Clause in a case where the State admitted it struck a juror because he was male).

"Once discrimination in jury selection has occurred, the harm is done. The system, the litigant, and the juror have already sustained injury." *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d. 896, 906 (Tenn. 1996). But in the face of that constitutional injury, the majority constructs a fortress of procedural barriers to deny Bell any remedy.

It concludes first that Bell's constitutional claim is not preserved because Bell's counsel objected to racial discrimination, not gender discrimination, during voir dire. Then it determines that Bell's challenge—brought in a motion for appropriate relief based on the new evidence not available to Bell or his counsel during trial—is procedurally barred. It reasons that evidence other than the State's direct admission of gender discrimination would have enabled Bell's counsel to adequately raise the issue. (It cites, for example, the prosecutor's personal notes—which again were not available to defendants until after their convictions. It does not mention North Carolina's virtually impossible track record on such claims.) Even then, the majority suggests that the State may have had cause to strike Ms. Morrow regardless. The majority faults the defendants' initial trial counsel for failing to object on gender discrimination grounds in the face of the State's many discriminatory statements—

but it does not explain why such apparently incompetent lawyering fails to qualify the defendants for the "good cause" exception to the procedural bar. N.C.G.S. § 15A-1419(a)(3), (b)(1) (2023). It even shames defense counsel for what it perceives to be that side's practices of gender discrimination, ignoring the Supreme Court's admonition that "[d]iscrimination against one defendant or juror on account of [gender] is not remedied or cured by discrimination against other defendants or jurors on account of [gender]." *Flowers*, 139 S. Ct. at 2242.

The majority's opinion thus makes explicit what the thrust of this Court's jurisprudence has conveyed for some years: *Batson* and *J.E.B.* relief is effectively unavailable on appeal and violations of the constitutional right first recognized in *Strauder* cannot be vindicated if not remedied by the trial court during jury selection.

The majority implies that the evidence at trial, including remarks by a different prosecutor than Mr. Butler made days before and after Ms. Morrow was struck, was sufficient to make out a *J.E.B.* claim had Bell's counsel only objected when Ms. Morrow was struck or argued it on direct appeal. But this Court in *Campbell*, 384 N.C. 126, effectively heightened what is required for a prima facie showing. Had the trial court rejected that hypothetical *J.E.B.* objection, as it did for the *Batson* objections, Bell would unlikely have been able to reverse that decision on appeal, because this Court has narrowed its review to the circumstances known to the trial court at the time of the objection based on the cold record "giving appropriate deference to the trial court's determination." *Id.* at 136. Moreover, on direct appeal

Bell's counsel *did* raise and litigate a *Batson* challenge, mistakenly guessing that Ms. Morrow was struck because she was Black, not because she was a woman, since prosecutors had exercised peremptory challenges to exclude nine out of the eleven African American prospective jurors who expressed a willingness to impose the death penalty. But our Court rejected that *Batson* challenge in the face of similar evidence the majority cites here, again deferring to the trial court's decision that the State had offered nondiscriminatory justifications for the strikes. *State v. Bell*, 359 N.C. 1, 12–16 (2004). The majority offers scant reason to think a *J.E.B.* objection at trial or raised on appeal would have fared better.

Not having objected at trial, Bell could have tried to raise the gender discrimination issue on appeal anyway, without the admission from the affidavit or the jury questionnaire notes. But an appellate court would have applied plain error review under this Court's precedent in *Maness*, 363 N.C. at 273. And this Court seemingly toughened the plain error standard in *State v. Reber*, 386 N.C. 153 (2024), by requiring a defendant to prove both that "the jury probably would have returned a different verdict" and that "the error is an exceptional case." *Id.* at 158 (cleaned up). Moreover, *Maness* made clear that Rule 2 of the North Carolina Rules of Appellate Procedure is not available to criminal defendants claiming gender discrimination, because a "defendant's claim of gender bias in the State's peremptory challenge of prospective juror [Morrow] is not an exceptional circumstance calling for invocation of Rule 2." 363 N.C. at 274.

That leaves the defendants with only the possibility of post-conviction relief. Mr. Butler's affidavit admitting his improper motives is "new evidence" that could not have been obtained by reasonable diligence. After all, evidence from a prosecutor's personal notes during voir dire is commonly unavailable until the prosecution's trial file is turned over during post-conviction proceedings yet can still give rise to a successful *Batson* or *J.E.B.* challenge. *See Foster v. Chatman*, 578 U.S. 488, 493, 504 (2016). And we held in *State v. Jackson*, 322 N.C. 251 (1988), that a defendant who brings a *Batson* challenge has no right to examine the prosecuting attorney as to their true motives in a separate hearing. *Id.* at 258. But in *Tucker*, this Court ascribed near superhuman quality to an indigent, incarcerated criminal defendant's capacity to discover such information with "reasonable diligence in time to present the claim" under N.C.G.S. § 15A-1419(c). *Tucker*, 385 N.C. at 502, 506 (suggesting that the defendant's appointed counsel could have petitioned the court for funds to self-produce an academic study, originally authored by two full-time academics including one who holds a doctorate and later dismissed by this Court as "unreliable and fatally flawed").

Even if this evidence were not "new," a defendant is still eligible for post-conviction relief by showing good cause and actual prejudice. N.C.G.S. § 15A-1419(b)(1). Yet *Tucker* also suggested that the "actual prejudice" standard simply boils down to an inquiry as to whether the trial court would have made a different decision at step one of a *Batson* determination in light of the new information. *Id.* at

510. It is unclear that this Court would even consider this new evidence of the prosecutor's motive at step one, because it declined to do exactly that in *Tucker* by ignoring the prosecutor's *Batson* "cheat sheet." *See id.* (concluding that a document suggesting pretext by the State in striking jurors was *not probative* at step one, because "the prosecutor's reasons justifying the peremptory strikes and whether they show pretext and purposeful discrimination" are step two and three inquiries).

So while the majority makes great efforts to pin the outcome of this case on procedural bars, reading in a general preservation requirement to N.C.G.S. § 15A-1419 and shifting responsibility to defense counsel, that reasoning itself is unnecessary to the outcome. This Court's existing jurisprudence forecloses the relief defendants seek. Thus discriminatory behavior by the State faces no consequence of any kind, even in this most extraordinary of cases with direct evidence of intentional gender discrimination. Instead our jurisprudential shell game transmogrifies constitutional protections into a mirage.[3]

### III. *Batson*'s Deficiencies and Remedial Challenges

Understanding our jurisprudence in this way reinforces the underlying truth: *Batson* and *J.E.B.*'s three-step test and its corresponding remedial scheme is

---

[3] While professing to abhor the "reprehensible and insidious nature of discrimination in the jury selection process," the majority goes on to ratify a jurisprudence this Court alone is responsible for and case law which this Court fully has the power to change, case law that makes it nearly impossible to address that discrimination. *See* majority *supra* Part V. That jurisprudence is contrary to Supreme Court precedent, and no amount of hypocritical empty words can hide the fact that the majority abandons its responsibility to enforce constitutional guarantees of equal justice under the law.

fundamentally flawed. Even though *Batson*'s driving principles are integral to our constitutional order, the current doctrine frustrates rather than vindicates them.

Scholars and jurists have long identified the problems of creating a "legal test that will objectively measure the inherently subjective reasons that underlie use of a peremptory challenge." *Miller-El II*, 545 U.S. at 267 (Breyer, J., concurring). Start at step one. The prima facie showing is "not intended to be a high hurdle" or create an onerous burden. *State v. Waring*, 364 N.C. 443, 478 (2010) (cleaned up). It instead serves as a rough winnowing mechanism, quickly separating frivolous claims from meritorious ones. *See Bennett*, 374 N.C. at 598 (noting that a claimant satisfies *Batson*'s first step "so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose" (cleaned up)). But in many cases, *Batson*'s first step is the final one. According to some scholars, that is because courts use it as a "gatekeeping tool." *See* Emily Coward, *Policing Jury Discrimination in North Carolina: What's Happening and What's at Stake?*, Wilson Ctr. for Sci. and Just. at Duke U. Sch. of L. 1, 7 (2023), https://wcsj.law.duke.edu/wp-content/uploads/2023/06/Policing-Juror-Discrimination-in-North-Carolina-June-15-2023.pdf (last visited Mar. 18, 2025). If a court determines that a claimant did not establish a prima facie case of discrimination, the inquiry ends there. There is no need to consider the prosecution's reasons for the strike or whether those justifications are pretextual. For that reason, *Batson*'s first step has become an exit ramp, allowing courts to nip an objection in the bud and "avoid[ ] parsing difficult evidence of racial discrimination." *Id.*

*Batson*'s second step fares little better. To prevail, a prosecutor need only offer a neutral reason for his strike, not a "persuasive, or even plausible" one. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). Random observations that "the mustaches and the beards look suspicious" suffice. *Id.* at 766. And justifications that a juror participates in a Black Lives Matter event are a race-neutral explanation. *Campbell*, 384 N.C. at 130, 136.

At step three, focus shifts to the trial judge. To resolve a *Batson* objection, judges must weigh evidence of discrimination against the prosecutor's explanation. But that, too, presents difficulties. In sustaining a *Batson* claim, a judge must effectively brand an attorney as both a bigot and a liar: A bigot for discriminating against prospective jurors, and a liar for trying to cover it up. *See* Robin Charlow, *Tolerating Deception and Discrimination After* Batson, 50 Stan. L. Rev. 9, 11 (1997) (noting that one judge "had the uncomfortable feeling that she had just rendered an official ruling that the attorney was lying to the court"). The requirement places judges in an understandably "awkward" position—especially when many attorneys are repeat players in their courtrooms. *See Miller-El II*, 545 U.S. at 267 (Breyer, J., concurring). This Court recognized those tempestuous "interpersonal dynamics" in *Clegg,* noting that "a trial judge may feel understandably or unconsciously hesitant to imply that a prosecutor engaged in racial discrimination while that prosecutor is standing right in front of her." 380 N.C. at 144 n.1.

Notice, too, that these three steps make little space for addressing unconscious

bias and discrimination, such as assumptions that a female juror is insufficiently "strong," or observations "that a prospective black juror is 'sullen,' or 'distant.' " *Batson*, 476 U. S. at 106 (Marshall, J., concurring); *see also* Antony Page, Batson's *Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. Rev. 155, 161 (2005) (noting that "subtle forms of bias are automatic, unconscious, and unintentional" and "escape notice, even the notice of those enacting the bias" (cleaned up)).

*Batson*'s remedies pose yet another challenge. *Batson* itself dedicated a single footnote to this all-important question. *See Batson*, 476 U.S. at 99 n.24. And the Court's scant discussion focused solely on in-trial *Batson* remedies. *Id.* That is, what trial judges should do if they identify a *Batson* violation when it happens. If a judge finds that a prosecutor discriminated against jurors, she may "disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire," or she may "discharge the venire and select a new jury from a panel not previously associated with the case." *Id.* This Court has endorsed the latter approach where the sitting jury was aware of the improper strike. *See McCollum*, 334 N.C. at 235–36.

The remedy on appeal presents a more difficult question. When a case reaches us, the jury was already impaneled, the trial already held, and the verdict already delivered. An appellate court has comparatively few vehicles for relief. We can remand a case for reconsideration of the *Batson* claim, *e.g.*, *Hobbs*, 374 N.C. at 360

(remanding *Batson* claim to the trial court), or we can reverse the defendant's conviction and order a new trial, *e.g.*, *Clegg*, 380 N.C. at 162; *Bennett*, 374 N.C. at 602. Sometimes the relief is hollow because the defendant has already completed their sentence. *See Clegg*, 380 N.C. at 164 (Earls, J., concurring). And sometimes, where the crime is horrific and the evidence overwhelming, it may be too difficult for a court to stomach ordering a new trial.[4]

Accordingly, courts have taken a variety of approaches to enforcing *Batson* and *J.E.B.* Some courts reverse and automatically order a new trial for *Batson* violations, *see, e.g.*, *People v. Yarbrough*, 999 N.W.2d 372, 380–81 (Mich. 2023), while others employ a prejudicial error standard, *see, e.g.*, *Winston v. Boatwright*, 649 F.3d 618, 632 (7th Cir. 2011) ("Prejudice, in other words, is automatically present when the selection of a petit jury has been infected with a violation of *Batson* or *J.E.B.*"); *Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1317 (11th Cir. 2003) (holding that an appellant may demonstrate prejudice by showing a "reasonable probability" that a *Batson* challenge would have prevailed on appeal had trial counsel preserved it).

But these appellate remedies are effectively unavailable in this state. Too often we fail to make right the constitutional harm. Yet everything *Batson* said about the

---

[4] *E.g.*, John C. Jeffries Jr., *The Right-Remedy Gap in Constitutional Law*, 109 Yale L. J. 87, 90 (1999) (theorizing that a remedial pivot from damages to injunctive relief could "facilitate[ ] constitutional change by reducing the costs of innovation" and "shift[ing] constitutional adjudication from reparation toward reform"); Richard Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Cal. L. Rev. 933, 938 (2019) (discussing how remedies impact courts' interpretation of Fourth Amendment "reasonableness" and their willingness to enforce it).

evils of jury discrimination remains true. Discriminatory jury strikes deny defendants their right to an impartial jury of their peers, dilute the quality and fairness of jury verdicts, and strip excluded jurors of their dignity and equality as citizens in a democratic society. [5] *See Clegg*, 380 N.C. at 169 (Earls, J., concurring).

## IV.    Other Paths Forward

The importance of fair jury selection places a duty on this Court. "If we are to give more than lip service to the principle of equal justice under the law," we must "take reasonable steps to address" *Batson*'s obstacles. *Id.* at 173, 170. We "have considerable discretion in structuring [our state's] jury-selection processes" under *Batson* and *J.E.B.* Jason Mazzone, Batson *Remedies*, 97 Iowa L. Rev. 1613, 1614 (2012). We must use the arsenal of tools at our disposal. *Clegg*, 380 N.C. at 173.

Other state courts have recognized *Batson*'s shortcomings and acted to remedy them. Washington's Supreme Court, for instance, has retooled *Batson*'s standard, recognizing that the existing framework "fail[ed] to adequately address the pervasive problem of race discrimination in[ ]jury selection." *State v. Jefferson*, 429 P.3d 467, 481 (Wash. 2018). The court placed particular weight on *Batson*'s inability to reach implicit bias. *See id.* at 480–81. As it explained in past cases, "*Batson* recognizes only

---

[5] Studies show that more diverse juries dig deeper into the evidence, deliberate longer, and consider more perspectives and viewpoints in reaching a verdict. *See* Nancy S. Marder, *Juries, Justice, and Multiculturalism*, 75 S. Cal. L. Rev. 659, 687–98 (2001); Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Person. & Soc. Psych. 597, 603–06 (2006); Erin York Cornwell & Valerie P. Hans, *Representation Through Participation: A Multilevel Analysis of Jury Deliberations,* 45 Law & Soc'y Rev. 667, 668–69 (2011).

'purposeful discrimination,' whereas racism is often unintentional, institutional, or unconscious." *State v. Saintcalle*, 309 P.3d 326, 329 (Wash. 2013). To bridge that gap, the court swapped *Batson*'s subjective standard with an objective one. *See Jefferson*, 429 P.3d at 480. In 2018, it adopted a rule which, among other things, eliminated *Batson*'s first step, instead requiring trial courts to consider baseline criteria. *See* Wash. R. Gen. Application R. 37. The rule identifies a set of facially neutral reasons for striking that are "presumptively invalid" because of their racist and sexist undertones. *Id.* Early evidence suggests that the rule lessened the frequency of discriminatory peremptory strikes and more often afforded a remedy. *See* Annie Sloan, Note, *"What to do about* Batson*?": Using a Court Rule to Address Implicit Bias in Jury Selection*, 108 Calif. L. Rev. 233, 257 (2020); Nancy S. Marder, *Race, Peremptory Challenges, and State Courts: A Blueprint for Change*, 98 Chi.-Kent L. Rev. 67, 86–91 (2024) (observing an impact in nine of twenty-nine relevant cases).

Arizona has gone even further. Just four years ago, the state's Supreme Court eliminated peremptory challenges in both civil and criminal trials. *See* Order Amending Rules 18.4 and 18.5 of the Rules of Criminal Procedure, and Rule 47(e) of the Rules of Civil Procedure, Ariz. Sup. Ct. No. R-21-0020 (Aug. 30, 2021).[6]

---

[6] Some scholars have advocated for the elimination of peremptory strikes for the State only. *See, e.g.*, Anna Roberts, *Asymmetry as Fairness: Reversing a Peremptory Trend*, 92 Wash. U. L. Rev. 1503, 1506, 1514, 1523, 1549–50 (2015). At least one district attorney abandoned the practice of using peremptory strikes in misdemeanor trials. Sheraz Sadiq, *Outgoing Multnomah County DA Changes Jury Selection for Misdemeanor Trials*, OPB (July 24, 2024), https://www.opb.org/article/2024/07/24/think-out-loud-outgoing-multnomah-county-district-attorney-jury-selection-misdemeanor-trials.

Other potential innovations include reimagining the traditional three-step *Batson* framework and the remedy for a *Batson* violation. For example, courts might require the striking party to actually rebut some of the evidence presented in the prima facie case and narrow the voir dire remedy to immediately reseat an improperly stricken juror without their knowledge that they were improperly stricken to begin with. *See* Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L. Rev. 1075, 1110–11, 1121 (2011). Some scholars have suggested moving the peremptory strike system to one of negotiation—allowing peremptory strikes only on the consent of both parties. Caren Myers Morrison, *Negotiating Peremptory Challenges*, 104 J. Crim. L. & Criminology 1, 42–44 (2014) (proposing a procedure for negotiating peremptory challenges during voir dire). Other scholars and courts have proposed expanding remedies for *Batson* violations to include professional or ethical consequences. *E.g.*, Darby Gibbins, Comment, *Six Trials & Twenty-Three Years Later: Curtis Flowers and the Need for a More Expansive* Batson *Remedy*, 59 Hous. L. Rev. 713, 737 (2022) (cataloging arguments for and against this proposal); *People v. Willis*, 43 P.3d 130, 137 (Cal. 2002). New York's highest court has embraced forfeiture of an improperly-exercised peremptory challenge after reseating the challenged juror as a permissible remedy. *People v. Luciano*, 890 N.E.2d 214, 216–19 (N.Y. 2008).

Whatever the solution, the way forward requires courage. It requires rooting

out discrimination that surfaces in whispers as well as when the quiet part is said out loud. And it requires a commitment to the values *Batson* and *J.E.B.* strive to protect but too often fall short of: fairness, dignity, and equal justice under law.

## V.    Conclusion

Counsel for Bell's co-defendant, Sims, at argument asked of this Court: "Is it really the case that the court system is powerless to respond when the prosecutor withholds material information about the basis of a peremptory strike and then years later belatedly confesses that the strike was motivated by discriminatory intent?"[7] Today this Court says yes.

I reluctantly concur in the result only because I cannot envision a scenario in which Bell would have been able to obtain the relief he seeks under our existing precedent. The majority's opinion validates the longstanding concerns that *Batson* and *J.E.B.* would become effectively "a right without a remedy." *Jackson*, 322 N.C. at 260 (Frye, J., concurring). I do not believe our court system is so powerless, and I look forward to a day when our Court has the courage to enforce such foundational constitutional rights with an even hand.

Justice RIGGS joins in this concurring in the result only opinion.

---

[7] Oral Argument at 22:00, State v. Sims (No. 297PA18) (Apr. 9, 2024), https://www.youtube.com/watch?v=rXqfIETGr1U (last visited Mar. 18, 2025).